Borrello, P.J.
*559 The prosecution appeals by leave granted[1] the trial court's opinion and order, following remand from the Michigan Supreme Court, which granted defendant's motion to suppress statements made during a custodial interrogation without being advised of his Miranda[2] rights. For the reasons set forth in this opinion, we affirm.
I. BACKGROUND
This case arises out of the death of Amy Wienski, defendant's alleged girlfriend. This matter was initially before this Court when the prosecution filed an *560 interlocutory appeal of the trial court's decision to grant defendant's motion to suppress his statements, and this Court affirmed on different grounds. People v. Barritt , 318 Mich. App. 662, 671, 899 N.W.2d 437 (2017), vacated in part 501 Mich. 872, 901 N.W.2d 859 (2017). The prosecution filed an application for leave to appeal this Court's prior decision in the Michigan Supreme Court, and in lieu of granting leave to appeal, the Michigan Supreme Court vacated the holding of this Court that defendant was "in custody." People v. Barritt , 501 Mich. 872, 901 N.W.2d 859 (2017). The Michigan Supreme Court determined that this Court had properly concluded that when deciding whether defendant was in custody, the trial court had applied the wrong legal standards. Our Supreme Court remanded the matter to the trial court for application of the correct standards, directing the trial court
to determine, in light of all of the objective circumstances surrounding the interrogation: (1) whether a reasonable person would have felt that he was not at liberty to terminate the interrogation and leave; and (2) whether the environment presented the same inherently coercive pressures as the type of station house questioning involved in [ Miranda ]. See Howes v. Fields , 565 U.S. 499, 509, 132 S.Ct. 1181, 182 L.Ed.2d 17 (2012) ; Yarborough v. Alvarado , 541 U.S. 652, 663, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ; People v. Elliott , 494 Mich. 292, 308[, 833 N.W.2d 284] (2013). [ Barritt , 501 Mich at 872. ]
On remand, the trial court granted defendant's motion to exclude his statements and suppressed the evidence, finding that defendant was in custody for purposes of *814 Miranda under the standards set forth in the Michigan Supreme Court order. This interlocutory appeal by the prosecution followed.
On appeal, the prosecution argues that the trial court erred when it granted defendant's motion to suppress because defendant was not in custody for *561 purposes of Miranda when he made the statements and that, therefore, what the prosecution describes as his voluntary, uncoerced, and noncustodial statements are admissible at trial. The prosecution argues that defendant was not in custody for Miranda purposes because he voluntarily agreed to accompany the police in a marked vehicle to the station, he voluntarily provided information about the victim, the room where defendant was interviewed was unlocked with people coming and going, the interview only lasted 90 minutes, and defendant continued to speak after he was told he could stop the interview.
II. ANALYSIS
" 'The ultimate question whether a person was "in custody" for purposes of Miranda warnings is a mixed question of fact and law, which must be answered independently by the reviewing court after review de novo of the record.' " People v. Coomer , 245 Mich. App. 206, 219, 627 N.W.2d 612 (2001) (citations omitted). This Court reviews for clear error the trial court's factual findings concerning the circumstances surrounding statements to the police. Id ."A finding is clearly erroneous if, after reviewing the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." Id .
Every person has a constitutional right against self-incrimination. U.S. Const., Am. V ; Const. 1963, art 1, § 17. To effectuate this right, the police must warn a defendant of his or her constitutional rights if the defendant is taken into custody for interrogation. People v. Cortez (On Remand) , 299 Mich. App. 679, 691, 832 N.W.2d 1 (2013) (opinion by METER , J.). Statements made by a defendant to the police during a custodial interrogation are not admissible unless the defendant *562 voluntarily, knowingly, and intelligently waives the constitutional right against self-incrimination. People v. Tierney , 266 Mich. App. 687, 707, 703 N.W.2d 204 (2005).
It is undisputed that defendant was not advised of his Miranda rights when he was questioned by the detectives. The issue now before this Court is whether defendant was in custody for Miranda purposes and whether the statements he made to police are, therefore, inadmissible given the lack of Miranda warnings.
A. FREEDOM OF MOVEMENT
The Supreme Court has stated that "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of "the objective circumstances of the interrogation," Stansbury v. California , 511 U.S. 318, 322, 325, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994), a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave," Thompson v. Keohane , 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) ; Fields , 565 U.S. at 509, 132 S.Ct. 1181. Further, we have been instructed by the Supreme Court that in order to determine how a suspect would have "gauge[d]" his or her "freedom of movement," courts must examine "all of the circumstances surrounding the interrogation...." Stansbury , 511 U.S. at 322, 325, 114 S.Ct. 1526. The relevant circumstances are as follows: (1) the location of the questioning, see *815 Maryland v. Shatzer , 559 U.S. 98, 105-107, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010) ; (2) the duration of the questioning, Berkemer v. McCarty , 468 U.S. 420, 437-438, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) ; (3) statements made during the interview, *563 Oregon v. Mathiason , 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) ; Yarborough v. Alvarado , 541 U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ; Stansbury , 511 U.S. at 325, 114 S.Ct. 1526 ; (4) the presence or absence of physical restraints during the questioning, New York v. Quarles , 467 U.S. 649, 655, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) ; and (5) the release of the interviewee at the end of the questioning, California v. Beheler , 463 U.S. 1121, 1122-1123, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (as quoted in Fields , 565 U.S. at 509, 132 S.Ct. 1181 ). These cases stress that no one circumstance is controlling; rather a reviewing Court must consider the totality of the circumstances when deciding whether an individual was subjected to custodial interrogation under Miranda . Fields , 565 U.S. at 517, 132 S.Ct. 1181. Hence, we begin our analysis by going through each of the circumstances set forth in Supreme Court caselaw to determine whether defendant was subjected to custodial interrogation. Fields , 565 U.S. at 509, 132 S.Ct. 1181.
1. LOCATION
In this case, the trial court found, and the parties agreed, that defendant was questioned at a police station. From the descriptions provided by the questioning officers and from what can be gleaned from the taped interview, defendant was questioned in a small police office located within a larger governmental building in Homer, MI. The trial court described it as a "satellite office of the Calhoun County Sheriff's Department...." A police station is a "police-dominated atmosphere" as contemplated by Miranda . Miranda , 384 U.S. at 445, 86 S.Ct. 1602. However, in Mathiason , 429 U.S. 492, 494-496, 97 S.Ct. 711, the Supreme Court reversed the Oregon Supreme Court's conclusion that because defendant's questioning had taken place in a police station, the *564 interrogation took place in a coercive environment and that defendant was therefore subjected to custodial interrogation. In Mathiason , the defendant was a suspect in a burglary. Id . At 493. An officer attempted to make contact with the defendant, eventually leaving his card at the defendant's apartment and requesting that the defendant call him, which the defendant did. Id . When the defendant called, the officer asked where the defendant would like to meet, and after the defendant offered no preference, the officer suggested the state patrol office. Id . The defendant met there with the officer who, on arrival, told the defendant that he was not under arrest but that he should be truthful. Id . The defendant confessed after being (wrongfully) told by the officer that his fingerprints were found at the scene. Id . In reversing the Oregon Supreme Court's conclusion that the defendant was subjected to custodial interrogation, the United States Supreme Court held:
In the present case, however, there is no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way. He came voluntarily to the police station, where he was immediately informed that he was not under arrest. At the close of a 1/2-hour interview respondent did in fact leave the police station without hindrance. It is clear from these facts that Mathiason was not in custody "or otherwise deprived of his freedom of action in any significant way."
Such a noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom *816 of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. *565 But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was that sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited. [ Id. at 495, 97 S.Ct. 711.]
In this case, the trial court acknowledged that in light of Mathiason , the fact that interrogation occurred at a police station was not dispositive. However, the court also stated:
Still, the location of the questioning in the instant case weighs in favor of a finding that Defendant was in custody. Police officers have an inherent authority that generally elicits respect from the public. The average person that is summoned to a police station to talk with a detective would not feel comfortable leaving the station until the discussion was terminated by that detective. In this case, Defendant was taken to the station house in the back of a police car. He was not allowed to travel to the station with [Ron] Greenway, the person Defendant had ridden with to Wienski's house despite the fact that Greenway too was driving to the station. Defendant was removed from the car and escorted into the station by armed officers. He was then placed in a room for questioning with only police present and a police dog in close proximity. A reasonable person in that situation would not have felt comfortable leaving the station without clear permission from an officer, permission that Defendant never received.
This Court has recognized that "[a] person who is 'cut off from his normal life and companions,' and abruptly transported from the street into a 'police-dominated atmosphere,' may feel coerced into answering questions." Cortez , 299 Mich. App. at 695, 832 N.W.2d 1 (quotation *566 marks and citations omitted). In Yarborough , the United States Supreme Court concluded that the state court had reasonably determined that the defendant was not in custody for Miranda purposes, because the defendant was not transported to the station house by police.
Contrary to the facts set forth in Yarborough , here, defendant was transported to the police station by armed police officers, a fact on which the trial court placed a great deal of emphasis. The prosecution argues that this factor does not weigh in favor of finding that defendant was in custody because defendant agreed to speak with the police officers at a location different from Wienski's house. According to the prosecution, defendant arrived at Wienski's house as the passenger in a vehicle driven by another individual, identified as Ron.[3] Defendant asserted that he met Ron the day before and that Ron drove defendant home in exchange for a generator. According to the prosecution, Detective Bryan Gandy asked defendant if he would *817 go to the police station to talk in a "better area" than on the lawn at Wienski's home, and defendant agreed. Deputy Kevin Mahan then "had defendant take a seat" in the back of his patrol vehicle to transport defendant to the satellite office. Mahan did not force defendant into the car or place defendant under arrest. Defendant was not handcuffed during the ride. However, as noted by the trial court, defendant was not offered the opportunity to ride with Ron to the police station. According to the prosecution, the detectives offered defendant a ride "out of convenience," and defendant accepted. *567 The prosecution further argues that despite questioning occurring at the police station, the doors to the office where the questioning took place remained unlocked, which also weighs against a finding of custody. Gandy testified that the office doors locked from the outside, "like a school," so an individual could exit the office freely but that entrance into the office was restricted. During the interrogation video, a knock is heard on the door behind defendant, and one of the detectives stood up, opened the door, and was seemingly handed the drink that defendant was offered. Gandy did not lock the doors once defendant was inside the office. Other people entered and exited the room freely. Defendant is seen in the video watching people enter and exit through the door located behind him. There are sounds of doors being opened and closed in the background of the interrogation video. There were two doors in the office that exited the room and another door to an attached office. Gandy testified that defendant sat next to a door that exited the office. A door is visible in the interrogation video behind defendant and to his right, but the actual door knob is not within the camera's frame for the entirety of the video. At one point, Gandy said that he needed to step out for a minute. In the interrogation video, a uniformed individual left through the door behind defendant, but only the back of his body from the shoulders down is visible. Presumably, this was Gandy. From the background sound of the video, it did not sound like Gandy had to use a key or badge to open the door behind defendant. Gandy returned to the interrogation room, and then Detective Steve Hinkley stepped out.
Although there is evidence that the office doors were unlocked, this does not outweigh the fact that questioning occurred in an office at the police station, *568 in the constant presence of armed police officers, or that defendant was escorted into the room by armed police officers after being transported in a marked police car. It is unlikely that a reasonable person would believe that they were free to terminate the interview and leave after being transported to the station in a marked vehicle, escorted into the building by armed police officers, and questioned by armed police officers who used an increasingly hostile tone. Additionally, the fact that the police knew that defendant did not have his own vehicle and insisted that he be driven in a police vehicle supports the trial court's finding that the police took defendant into custody off his front lawn.
We recognize that the facts presented in this case are certainly subject to interpretation. However, the prosecution seems to place too great an emphasis on the subjective intent of the officers and defendant in asking us to find that the trial court clearly erred by finding that the evidence favored a finding that defendant was in custody relative to the issue of where the questioning took place. However, caselaw dictates that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either *818 the interrogating officers or the person being questioned." Stansbury , 511 U.S. at 323, 114 S.Ct. 1526. This Court has made similar legal pronouncements. In People v. Zahn , 234 Mich. App. 438, 449, 594 N.W.2d 120 (1999), we wrote, "The determination of custody depends on the objective circumstances of the interrogation rather than the subjective views harbored by either the interrogating officers or the person being questioned." See also, Coomer , 245 Mich. App. at 219-220, 627 N.W.2d 612. Applying that standard, we cannot conclude that the trial court clearly erred when it found that the totality of the factors regarding the *569 location of the questioning weighed in favor of a finding that defendant was in custody.[4]
2. DURATION
Gandy testified that the interview lasted approximately 90 minutes, the same amount of time as the interrogation video. The trial court determined that this was a neutral factor in making a custody determination, a finding in which we concur. The Yarborough Court determined that a two-hour interview weighed in favor of a finding of custody. Yarborough , 541 U.S. at 665, 124 S.Ct. 2140. Conversely, in Mathiason , the United States Supreme Court determined that a half-hour long interview did not constitute a custodial interrogation. Mathiason , 429 U.S. at 495, 97 S.Ct. 711. In People v. Mendez , 225 Mich. App. 381, 383, 571 N.W.2d 528 (1997), the defendant was also interviewed for 90 minutes. This Court concluded that the defendant was not in custody for Miranda purposes, likening the facts of the case to Mathiason because the defendant voluntarily went to the police station, was informed that he was not under arrest, and was permitted to leave at the end of the interview. Id . Lastly, in Fields , the defendant was questioned for five to seven hours; the Supreme Court-while stating that the interrogation length lent some support to the defendant's argument that the interrogation was custodial-nonetheless, ultimately concluded that the *570 interrogation length was not controlling as to whether the defendant was subjected to custodial interrogation. Fields , 565 U.S. at 515, 132 S.Ct. 1181.
3. STATEMENTS
In Yarborough , 541 U.S. at 665, 124 S.Ct. 2140, the Supreme Court held that failure to tell a suspect that he or she is free to leave is one factor that can contribute to a finding that a suspect was in custody. The Court stated, "Unlike the officer in Mathiason , [the officer] did not tell [defendant] that he was free to leave.... These facts weigh in favor of the view that [defendant] was in custody." Id . This factor has also been acknowledged by Justice MARKMAN , when he wrote for the majority in Elliott , 494 Mich. at 309, 833 N.W.2d 284 ; however he concluded that the lack of a similar statement was not pertinent to the defendant because he was already incarcerated. Unlike the facts presented to our Supreme Court in Elliott , here, defendant was taken from his front lawn to the back of a patrol car and ultimately to a police station. Hence we find the issue of whether defendant was told he was free to leave relevant in our determination *819 of whether defendant was subjected to custodial interrogation.
Gandy did not recall telling defendant that he was free to leave. He believed that he told defendant that they could finish the interview at any time. However, it was not until the end of the interview and after defendant stated that he needed a lawyer that Hinkley told defendant that he was not under arrest and could finish any time. This weighs in favor of a finding of custody. Id .
In addition to finding that the police did not initially tell defendant that he was not under arrest or that he could leave at any time, the trial court also found that *571 the increasingly accusatory nature of the interview weighed in favor of a finding of custody. See Tankleff v. Senkowski , 135 F.3d 235, 244 (C.A. 2, 1998) (holding that the officers' increasingly hostile questioning transformed an interrogation into custodial interrogation before the defendant was advised of his Miranda rights). And, as we noted earlier in this opinion, "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury , 511 U.S. at 323, 114 S.Ct. 1526. However, "an officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody," if the officer's views were "somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave." Id. at 325, 114 S.Ct. 1526.
Gandy described the interview as relaxed, and certainly in the beginning phases of the interview that appears to be an accurate description. Again, however, we note that while the subjective understandings of the police and suspect can be relevant, they are not controlling. Later in the interview, Gandy testified that there was a point when he started to feel like defendant was not telling the detectives everything that defendant knew. Hinkley asked defendant if he told them everything that he could think of, and defendant said that he did and that "[i]f there's anything else you can think of, please ask." Gandy remembered Hinkley saying, "no bull****," to defendant, but asserted that this was not confrontational. The change in tone of the detectives occurred about 53 minutes into the interview. At that point, Hinkley told defendant that he *572 thought that defendant loved Wienski, but he did not want defendant to "bull****," and that he thought something else had happened. Although Hinkley did not raise his voice, he became increasingly more aggressive toward defendant:
Detective Hinkley : So, here's the deal. Whatever petty bull****, and it's probably petty bull****, we don't care, but you got to be up front with me, man.
* * *
Detective Hinkley : And let me be honest with ya. You know that I know a lot more than what I'm saying. Okay? I do. All right? I ain't gonna bull**** ya.... I don't think you did anything to her. But, dude, there's some things that you're not telling me or there's some things you're not telling me accurate. All I ask of you is be straight up with me. If it's petty bull****, I don't give a f*** about it. It can go in the wind. It can go in the wind. I don't give a s***.
Hinkley asserted that the police knew that defendant had been driving Wienski's car over the past few days, but defendant denied it. Hinkley said that he did not believe defendant, and the detectives had "been *820 around the block 100 times." Hinkley also said that defendant had "been around the block" because he had been "in the system," referring to defendant's criminal history.[5] The detectives continued to assert that defendant was being untruthful, even though he said he was "being straight up."
[Defendant ]: I don't have anything on my chest. That's just it. That's why I'm saying how can I help you? It's like you're trying to tell me I'm doing something or did something or know something. I don't want to do nothin' but try to help to get her back.
*573 The detectives continued to disbelieve defendant and asked if defendant would pass a lie detector test. Defendant said that he would pass but that he would not take one because the detectives were "pointing fingers" at him. After approximately 1 hour and 14 minutes of questioning, defendant said, "Well, I think I need a lawyer now." Hinkley replied that defendant was not under arrest.
[Defendant ]: So, if that's the case, we can finish then?
Detective Hinkley : We can finish any time. But, what I'm saying to you is, here's the thing, you can finish any time you want. But, what I'm saying to you is ...
[Defendant ]: I don't want to not finish if it's going to hurt her, but I'm not gonna continue down this path.
At this point, Hinkley accused defendant of lying several times and told defendant to "man up." After an hour and 17 minutes, defendant said:
I don't like where this is going, with-it looks like I'm going to have to get a lawyer, because you guys are trying to put something on me and I'm not gonna say anything that would incriminate me for anything.
We concur with the trial court's conclusion that the accusatory nature of the questioning of defendant weighs in favor of a finding of custody. Tankleff , 135 F.3d at 244. The detectives interrogated defendant by asking questions and making statements that they knew were reasonably likely to elicit an incriminating response. See People v. White , 493 Mich. 187, 195, 828 N.W.2d 329 (2013). Defendant's statements make it clear that he did not think that he was at liberty to leave. He initially asked how he could help, but after defendant believed that the detectives were accusing him, he asked if they could finish. Seemingly, defendant *574 asked the detectives if they were finished so he would get their permission to leave.
Clearly, Gandy considered defendant a suspect before meeting with him. Although not used as a basis for the trial court's findings, when the police first came upon defendant, they were searching Wienski's home, where defendant stated he resided, pursuant to a search warrant. Although the record is somewhat vague as to the time outline, it does appear that before defendant arrived at the home, Gandy had procured a search warrant of Wienski's home, in part, by naming defendant as a suspect who burned her car. Hence, before Gandy met defendant, he had already identified defendant as a suspect, a fact that may explain the nature and tenor of the questioning. While we acknowledge that Gandy's beliefs are relevant "only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action,' " Stansbury , 511 U.S. at 325, 114 S.Ct. 1526, we *821 conclude that the accusatory tone of the questioning would lead a reasonable person to perceive that they were not free to leave until the police approved their departure from the interview. Again, while recognizing that the subjective opinions of the officers do not bear on our determination of whether defendant was in custody, if the officers' views were "somehow manifested to the individual under interrogation[, those views] would have affected how a reasonable person in that position would perceive his or her freedom to leave." Id.
After reviewing the facts surrounding the statements by the police and defendant in their totality, we are not left with a definite and firm conviction that a mistake was made by the trial court's finding that a reasonable person would not believe they were at *575 liberty to terminate the interview without incident, therefore, reasonably and objectively believing themselves to be in police custody. Coomer , 245 Mich. App. at 219, 627 N.W.2d 612.
4. PHYSICAL RESTRAINTS
There is no dispute that defendant was not initially handcuffed during the interview, and there is no dispute that he was handcuffed at minute 88 of the 90-minute interview for transport from the Calhoun County Sheriff's Department satellite office to the Mount Morris Township Police Department. Before he was handcuffed, defendant had not been formally placed under arrest by the Calhoun County detectives. Generally, the lack of handcuffs weighs against a finding of custody. See Mathiason , 429 U.S. at 495, 97 S.Ct. 711 ; Yarborough , 541 U.S. at 664, 124 S.Ct. 2140, and the trial court so found. However, after making this finding, the trial court found that there were other restraints present in this case. The trial court noted that defendant's having to ride to the police station in the back of a patrol car and being escorted into the police station by armed police officers were forms of restraint. Additionally, the trial court noted that defendant appeared to be in the presence of at least one armed police officer at all times. Finally, the trial court noted that after the tone of the interview became more heated, another officer told defendant that his police dog, which was present in the room, could "blow you right off your feet" if the officer "sen[t]" him. We examine each of these findings in order.
It is undisputed that defendant was driven to the satellite office in a police vehicle. As found by the trial court, this mode of transportation implies a physical restraint regardless of whether the prosecution's assertion *576 that defendant voluntarily accepted the ride is accurate. No one unambiguously testified that defendant was "escorted" into the station. However, Mahan testified that he let defendant out of the backseat of his car at the station and that defendant "went inside the office with [the] detectives." Gandy testified that he and Hinkley brought defendant inside. There is no indication in the record that the detectives threatened defendant or brandished any weapons during the interview; however, Gandy testified that he and Hinkley were armed during the interview. In viewing the totality of the circumstances, riding to a police station in a marked vehicle, being walked in by armed detectives, and then being interviewed by armed police officers constituted physical restraints on defendant's freedom of movement, and a reasonable person would not feel at liberty to terminate the conversation and leave under such circumstances.
The prosecution asserts that the presence of the canine officer and police dog did not present any restraints on defendant's movement. Seemingly, Hinkley *822 asked Sergeant Brad Hall[6] to enter the office so that he could step out to speak to Gandy. Hinkley asked defendant if he cared about the police dog entering the room, and defendant responded, "No. I like dogs." Hall entered the room with the police dog. Defendant engaged in casual conversation with Hall regarding the police dog:
Sergeant [Hall ]: He's a good boy. He's pretty friendly.
[Defendant ]: I bet he has his moments where he isn't.
Sergeant [Hall ]: Oh, he'll blow you right off your feet if I send him.
*577 [Defendant ]: Right. I bet.
Sergeant [Hall ]: Yeah. But, no, he's a good boy.
They continued to talk about the dog's toy, and how Hall used the dog for tracking. However, Hall then told defendant how important it was for defendant to tell the truth:
Sergeant [Hall ]: So, that's why it's really important. Sometimes people go all hardcore and whatever, and they-they wait until the very last second and it kind of makes 'em look really bad. So, it's best to-best to-to, I don't know, I guess you just want to make sure that-you seem like a really nice guy. You want to make sure that you're as truthful as possible because-because you know, it's going to be rough otherwise. You see what I mean?
[Defendant ]: Um-hum.
Sergeant [Hall ]: So, I don't know, that's just the only advice that I can give ya. It's always, always, no matter what situation you're in, it's always best to tell the truth. It's hard to stick with a lie.
After Gandy returned to the office and said that the Mount Morris Township Police Department wished to speak with defendant, Hall asked defendant if there was anything else that he wanted to say after their conversation. Hall said, "I know you got something else there. I can see it written all over your face." And he told defendant: "Just got to say-say the truth. Say what happened."
Some context to the conversation is important to note. The statement regarding the dog being able to "blow defendant off his feet" was made in response to a statement by defendant that the dog could really do some harm. After defendant made that statement, Hall told defendant that the dog would only do what he, *578 Hall, told the dog to do. We cannot find anything from the tape or the transcripts which would lead us to conclude that the dog was placed in the room as a means of physical control over defendant. Additionally, under these limited facts, we cannot conclude that a reasonable person would believe that the dog was present in the room as a means of physical control. Accordingly, we reject the trial court's finding that the presence of the police dog imposed a physical restraint on defendant's freedom to move. Even if we were to conclude, as suggested by defendant's counsel, that the police brought the dog into the room because defendant was "soft on dogs," we cannot conclude that the dog in any manner imposed a restraint on defendant's freedom. However, we do conclude that the trial court did not clearly err by finding that other physical restraints were placed on defendant, the degree to which favors a finding that defendant was in custody.
5. RELEASE
In Mathiason , 429 U.S. at 495, 97 S.Ct. 711, the Supreme Court used the fact that *823 the defendant was allowed to leave the police station at the end of the interview as one of the circumstances that led them to conclude that the defendant had not been in custody. In this case, at the end of defendant's interview, Gandy said that the Mount Morris Township Police Department wanted to talk to defendant, so at that time, Mahan handcuffed defendant and returned defendant to Mahan's patrol car for transport. After that, the following colloquy took place:
[Defendant ]: Am I under arrest?
Detective Gandy : We're transporting you to another department and that's going to be up to them. But, we can't transport you without being restrained, for safety reasons.
*579 [Defendant ]: He said yeah, so I am being arrested?
Unidentified Speaker : I didn't say yeah.
[Defendant ]: I thought you said yeah.
Unidentified Speaker : I didn't say nothin'[7] .
The prosecution argues that this factor weighs against a finding of custody because defendant was not arrested by the sheriff's department that conducted the interview. However, the prosecution also asserts that at the time of the handcuffs were placed on defendant, he was in custody for purposes of Miranda .[8] Defendant was not released upon termination of the questioning but, rather, was placed in handcuffs and transported to another police department. Because defendant was not released at the end of questioning, this factor weighs in favor of a finding of custody. Yarborough , 541 U.S. at 664-665, 124 S.Ct. 2140 ; Mathiason , 429 U.S. at 495, 97 S.Ct. 711.
Given the totality of the circumstances surrounding these factors and this Court's review for clear error of the trial court's factual findings concerning the circumstances surrounding statements to the police, we are not left with a definite and firm conviction that a mistake has been made relative to the trial court's factual findings. Coomer , 245 Mich. App. at 219, 627 N.W.2d 612. Further, with regard to the issue of whether defendant was in custody at the time of his interrogation, based on our *580 review of the totality of the circumstances, we concur with the trial court that a reasonable person in defendant's position would not have felt free to terminate the interview and leave. Fields , 565 U.S. at 509, 132 S.Ct. 1181 ; Cortez , 299 Mich. App. at 692, 832 N.W.2d 1. Accordingly, defendant was in "custody" at the time of his interrogation.
B. COERCIVE ENVIRONMENT
As our Supreme Court and the United States Supreme Court have stated, determining whether an individual's freedom of movement was curtailed is the first step in the analysis, not the last. Elliott , 494 Mich at 308, 833 N.W.2d 284 ; Fields , 565 U.S. at 509, 132 S.Ct. 1181. This point is best illustrated by the Supreme Court's ruling in Berkemer , 468 US 420. In Berkemer , the Supreme Court held that the roadside questioning of a motorist who was pulled over in a routine traffic stop did not constitute custodial interrogation.
*824 Id . at 423, 441-442, 104 S.Ct. 3138. The Supreme Court held "that 'a traffic stop significantly curtails the "freedom of action" of the driver and the passengers,' and that it is generally 'a crime either to ignore a policeman's signal to stop one's car or, once having stopped, to drive away without permission.' " Fields , 565 U.S. at 510, 132 S.Ct. 1181, quoting Berkemer , 468 US at 436. "[F]ew motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so." Berkemer , 468 US at 436, 104 S.Ct. 3138. Nevertheless, the Supreme Court held that a person detained as a result of a traffic stop is not in Miranda custody because such detention does not "sufficiently impair [the detained person's] free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." Id . at 437, 104 S.Ct. 3138. Hence, the temporary and what the Supreme Court characterized as "relatively nonthreatening"
*581 detention that follows a Terry[9] stop was insufficient for a finding of custody under Miranda . Id. What follows then is the idea that not all restraints on an individual's freedom of movement are tantamount to custody for purposes of deciding whether a person has been subjected to custodial interrogation under Miranda . The often-quoted statement from Berkemer makes the point: "[The Supreme Court] ha[s] decline[d] to accord talismanic power" to the freedom-of-movement inquiry. Id. at 437, 104 S.Ct. 3138. In all such cases, a reviewing Court must ask the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda . Fields , 565 U.S. at 509, 132 S.Ct. 1181.
On Supreme Court remanded this case, instructing the trial court to consider its decision in Elliott , 494 Mich. 292, 833 N.W.2d 284 ; Barritt , 501 Mich. 872, 901 N.W.2d 859. In Elliott , Justice MARKMAN , writing for the majority, concluded that the defendant was not "in custody" for Miranda purposes. Elliott , 494 Mich. at 295-296, 833 N.W.2d 284. The defendant was incarcerated for a parole violation, and he was taken to the jail library by a deputy where he was questioned by a parole officer for 15 to 25 minutes. Id . at 299, 308, 833 N.W.2d 284. The defendant was not physically restrained, but he was never told that he was free to leave the meeting and return to his jail cell. Id . at 308, 309, 833 N.W.2d 284. On the basis of these facts, as well as other considerations, Justice MARKMAN concluded that the inherently coercive pressures present in Miranda were not present in Elliott . Id . at 311. The defendant was not questioned for an extended time by armed police officers using a sharp tone and profanity; rather, the parole officer visited the defendant as part of her job. Id . at 311-312. The *582 defendant did not indicate that he did not want to speak to the parole officer. Id . at 312. Justice MARKMAN concluded that these circumstances were "hardly the sort of incommunicado, police-dominated atmosphere involving custodial interrogation and the 'overbearing' of the subject's will toward which Miranda was directed." Id . at 313, 833 N.W.2d 284.
We acknowledge that Gandy testified that, in his opinion, the police did not coerce defendant to talk. In fact, throughout the beginning of the interrogation video, defendant maintains a relaxed tone and posture, often laughing throughout the conversation. He lightheartedly told a story about Wienski's mom thinking that he had stolen one of her spoons on Thanksgiving. Defendant was asked what he *825 wanted to drink, and he jokingly responded, "Beer. Coke." However, the subjective opinions of the officer aside, the facts as a whole demonstrate that the environment presented what the trial court correctly labeled as "the same inherently coercive pressures as the type of station house questioning at issue in Miranda ." Unlike the defendant in Elliott who was incarcerated, from the time the officers saw defendant at Wienski's home, he was always in the company of at least one armed officer. Defendant was on his front lawn when he was told by the police to get into the back of a police car. Defendant's dog had been forcibly removed from the home by animal-control officers, and he had no idea where the dog had been taken or how he would be able to secure the dog's return. He was not able to drive to the police station in the same car that brought him to the house, despite the fact that the police had told defendant's driver to drive to the very same police station. When the police car stopped, testimony indicated that armed detectives led defendant from the police car into the police station. Also, from the testimony of the officers and review of *583 the video, we conclude that there was never a time when defendant was not being watched by an armed police officer. Defendant did not get to arrange the time of the interview, the place of the interview, or when the interview would conclude. Rather, defendant was told when he was being interviewed, where he was being interviewed, and the tenor of the interview. At the end of the interview defendant was handcuffed and placed in another police vehicle. In sum, defendant was never "free" to any significant degree. Rather, his freedom of movement, along with his choices, had been taken from him by police officers from the time he was told to get into the back of the patrol vehicle.
Hence, this is not a case in which defendant was already in police custody or incarcerated or one in which the defendant was allowed by the police to schedule a time or place for the interview or even select the mode of transportation to the interview. As alluded to in Elliott , it is difficult to imagine a setting other than prison in which an individual's freedom of movement is more controlled by outside factors. Defendant was not initially told he could leave or terminate the interview. Within a short time of being told he could end the interview at any time, defendant was handcuffed and placed inside another police vehicle for transportation to a different police station. The interview became increasingly accusatory as the detectives asserted that defendant was lying and that he did not tell them everything that he knew. The detectives asked defendant if he would pass a lie detector test, a statement indicative of psychological intimidation. An additional canine officer entered the room, again appealed to defendant's sense of honesty, and encouraged him to tell the truth. Taken together, these facts indicate a coercive environment. "Fidelity to the doctrine announced in Miranda requires that it be enforced *584 strictly, but only in those types of situations in which the concerns that powered the decision are implicated." Berkemer , 468 U.S. at 437, 104 S.Ct. 3138. Ultimately, it becomes apparent that this case is the type of situation that compels Miranda warnings be given.
Accordingly, we conclude that the trial court did not clearly err by finding that a reasonable person in defendant's position would have felt that he was not at liberty to terminate the interrogation and leave, and the environment presented the same coercive pressures as the type of station house questioning in Miranda . Therefore, defendant was "in custody," and his Fifth *826 Amendment rights were violated when he was not advised of his Miranda rights.
Affirmed.
M. J. Kelly, J., concurred with Borrello, P.J.

People v. Barritt , unpublished order of the Court of Appeals, entered February 22, 2018 (Docket No. 341984).

Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Although not specifically stated, it appears that Ron is referred to in the trial court's opinion by his last name, Greenway.

In reaching this conclusion, we reject the trial court's assertion that "[t]he average person that is summoned to a police station to talk with a detective would not feel comfortable leaving the station until the discussion was terminated by that detective." In this case, the trial court seems to infer that questioning a suspect in a police station, by itself, can provide a legal basis for a finding that a person is in custody. That conclusion runs afoul of Mathiason , and we therefore reject that portion of the trial court's analysis. Mathiason , 429 U.S. at 494, 97 S.Ct. 711.

Defendant told the detectives that he had been to court that day on a charge of possession of stolen property.

Although referred to as "Sergeant Brad" in the interview transcript, Mahan identified the canine officer as Brad Hall at the evidentiary hearing.

Our review of the audio recording leads us to believe that someone said "yeah" in response to defendant's question of whether he was under arrest.

Presuming an issue exists relative to whether defendant invoked his right to counsel, that issue was outside the scope of remand and was not considered by the trial court. Consequently, there is no record that would permit our review of the issue. Accordingly, we express no opinion as to whether, or when, defendant exercised his right for the presence of counsel.

Terry v. Ohio , 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).