*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
October 15, 2020

Plaintiff-Appellee,

v

No. 348373
Emmet Circuit Court
LC No. 18-004811-FC

JACOB JOHN WELD,

Defendant-Appellant.

Before: LETICA, P.J., and K. F. KELLY and REDFORD, JJ.

PER CURIAM.

Defendant, Jacob John Weld, appeals by right his jury trial convictions of two counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a); MCL 750.520b(2)(b) (sexual penetration of victim under the age of 13 and defendant 17 years of age or older). The penalty for this offense is life imprisonment "or any term of years, but not less than 25 years." MCL 750.520b(2)(b). The trial court sentenced defendant to two concurrent terms of 25 to 50 years' imprisonment. We affirm.

## I. BACKGROUND

Defendant admitted that he sexually assaulted the 9-year-old victim during an approximately 90-minute long interview with law enforcement. Initially, defendant claimed that any sexual assault of the victim occurred while he was asleep, but, as the interview progressed, defendant admitted to repeatedly sexually assaulting the victim over a two-year timeframe in various states, including Michigan.

At trial, the victim's foster mother testified that the victim asked to speak to her privately and revealed that defendant had penetrated her and also rubbed himself on her. The victim testified that defendant sexually assaulted her approximately 30 times in Michigan. The victim also testified that defendant called her over to him and told her to pull down her pants. Sometimes, defendant assaulted her during the day. The victim opined that defendant "seemed like he knew what he was doing, [] his eyes were open, and he was talking to" her. The victim further testified that defendant told her not to tell anyone. Additionally, the victim testified that defendant earlier assaulted her in Las Vegas, Nevada; Oklahoma; and Texas.

-1-

The law enforcement officers, who had interviewed defendant, testified about the interview and their investigation. Defendant's video-recorded interview was played for the jury. Therein, in describing his most recent assault, defendant admitted that, at around 9 p.m., he woke up "horny," and thought that he told the victim, "[d]on't say anything to anybody." Defendant described lifting the victim's legs up over his hip after she removed her pajama bottoms and underwear. Defendant admitted that he penetrated the victim's vagina with his penis for about five minutes. On a drawing, defendant indicated the extent of his penetration.

Shortly after these admissions, one of the troopers informed defendant that he was under arrest. Defendant received and waived his *Miranda*[1] rights. Defendant ultimately confessed to three penetrations—one in Oklahoma and two in Michigan. Defendant further reported that he twice sexually assaulted the victim in Las Vegas. Defendant described these earlier instances as involving him rubbing his penis on the victim's vagina without penetration.

Defendant confessed that his first Michigan penetration occurred while the sun was still up. He stated that he became aroused when the victim touched him. Defendant further confessed that he had previously told the victim to touch him and had taught her to "rub" his private part.

At the conclusion of the interview, defendant provided a hand-written statement, reading: "It happened five times, once in Oklahoma; two in Vegas; two times in Michigan. First two times was rubbing; three times penetration." Defendant told one of the troopers that he "never meant for it to happen . . . . [I]t's hard to face I did it." However, defendant added that the other interviewing trooper was "right" and that defendant needed help.

During the interview, defendant also admitted to viewing pornography on his cellular telephone and he consented to a law-enforcement search of this device. Forensic investigation revealed that defendant visited a number of sites on Pornhub.com, including two involving sleepwalking. During the interview, defendant claimed that he was not into child pornography and that the sites he had viewed involved role-playing adults.

While in jail awaiting trial, defendant also made several telephone calls to his mother that were recorded and played for the jury. On the day of his arrest, defendant admitted to molesting or penetrating the victim, but claimed to be asleep. In his second call on that day, defendant admitted that "it's happened more than once[.]" Two days later, defendant told his mother: "It wasn't penetration every time. It wasn't 'til the last time when I was sleeping." Nevertheless, defendant again admitted that the assaults happened once in Oklahoma, twice in Nevada, and twice in his mother's home. In a subsequent call, defendant expressed his desire to plead guilty to lesser charges, and, if that failed, to proceed to trial " '[c]uz . . . either way I'm guilty . . . . Either way I'm guilty." Defendant later explained: "I admitted everything, which I shouldn't have done, but, you know, I'm honest. . . . And with me being honest that just made their job easier." Defendant also lamented the potential 25-year penalty he was facing, complaining that murderers received lesser terms of incarceration. Defendant added, "I didn't commit hardly anything, but, you know, I mean it's still heinous what I did." Defendant urged his mother to search for a good lawyer, one who would fight for him, and, again expressed his desire to plead guilty to lesser charges. In his

---

[1] *Miranda v Arizona*, 384 US 436; 16 L Ed 2d 694; 86 S Ct 1602 (1966).

final call, defendant remarked that the "Olympic guy," presumably referencing Dr. Larry Nassar, deserved the 25-year mandatory-minimum penalty for molesting "like 500 girls." Unlike defendant, who only "did it once."

Despite defense counsel's request, the prosecution was unwilling to offer the plea deal that defendant sought. The case proceeded to trial and the jury convicted defendant of two counts of CSC-I.

After defendant appealed, he filed a motion for remand, contending that his second court-appointed trial counsel was ineffective for failing to move to suppress his confession and for failing to request a jury instruction on the voluntary-act requirement given defendant's assertions that his assaults occurred during unconscious activity, namely, sleepwalking. This Court denied defendant's motion without prejudice. *People v Weld*, unpublished order of the Court of Appeals, entered November 13, 2019 (Docket No. 348373).

## II. STANDARDS OF REVIEW

On appeal, defendant continues to assert that his trial counsel rendered ineffective assistance. When no *Ginther*[2] hearing has occurred, this Court's review is limited to mistakes apparent on the record. *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009). And the question of whether a person was in custody, requiring a *Miranda* warning, is a mixed question of fact and law that this Court reviews de novo after review of the record. *People v Barritt*, 325 Mich App 556, 561; 926 NW2d 811 (2018).

## III. ANALYSIS

We conclude that defendant's two ineffective-assistance-of-counsel arguments are both unavailing.

## A. FAILURE TO SUPPRESS THE INTERVIEW

"Both the Michigan and the United States Constitutions require that a criminal defendant enjoy the assistance of counsel for his or her defense." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). For a new trial to be warranted, "a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *Id*.

There is a "strong presumption that counsel's performance was born from a sound trial strategy." *Id*. at 52. A court must consider whether the strategic choices were made after an incomplete investigation and whether a choice was reasonable to the extent that reasonable professional judgment support the limitations on the investigation. *Id*. "[D]efense counsel is not required to make frivolous or meritless motions . . . ." *People v Knapp*, 244 Mich App 361, 386; 624 NW2d 227 (2001).

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

Defendant concedes that his interview was not custodial until the detective joined in. The small interview room at the state police post contained a round table that abutted a wall and two chairs. About thirty minutes lapsed with defendant admitting that it was possible that he had unknowingly sexually assaulted the victim as he slept. The trooper offered defendant an opportunity for a bathroom break as the trooper was going to get water; he also offered the same to defendant. At first, defendant declined the trooper's offer to use the restroom, but, on reconsideration, he used the facilities before voluntarily returning to the interview room alone. The detective brought in a third chair, sitting closer to defendant. It appears that the uniformed trooper and the detective were wearing holsters housing their service weapons. Defendant contends that the interview turned custodial as the detective's chair "blocked" the door, both troopers had weapons, and the detective's questioning was accusatory. As a result, defendant argues that the troopers were required to inform him of his *Miranda* rights. We disagree.

In *Miranda*, 384 US at 444, the United States Supreme Court held that the prosecution is not allowed to use any statements from a custodial interrogation unless procedural safeguards were used to secure the privilege against self-incrimination. Law enforcement must warn the defendant of his constitutional right against self-incrimination before beginning a custodial interrogation. *Barritt*, 325 Mich App at 561. When the defendant was not read his *Miranda* rights, the question becomes whether the defendant was in custody. See *id*. at 562. To determine whether the defendant was in custody, we consider the defendant's freedom of movement, *Barritt*, 325 Mich App at 562, and whether the environment of the interrogation was coercive, *id*. at 580-581. The defendant's freedom of movement is analyzed by considering the following five factors: (1) the location of the interview, (2) the duration of the questioning, (3) the statements made during the interview, (4) the presence or absence of physical restraints during the interview, and (5) whether the defendant was released after the questioning. *Id*. at 562-563. A court "must consider the totality of the circumstances when deciding whether an individual was subjected to custodial interrogation" and "no one circumstance is controlling[.]" *Id*. at 563. The determination of whether the defendant was in custody depends on the objective circumstances of the situation and not the subjective intent of law enforcement or the defendant. *Id*. at 568.

The first factor is the location of the interview. *Id*. at 562. There is no requirement that all interviews that occur at a police station require a *Miranda* warning. See *Oregon v Mathiason*, 429 US 492, 495-496; 97 S Ct 711; 50 L Ed 2d 714 (1977). Whether a person was transported to the police station by law enforcement can be relevant to whether the defendant was in custody. *Barritt*, 325 Mich App at 565-566. In *Barritt*, we noted that "[i]t is unlikely that a reasonable person would believe that they were free to terminate the interview and leave after being transported to the station in a marked vehicle, escorted into the building by armed police officers, and questioned by armed police officers who used an increasingly hostile tone." *Id*. at 568. We also noted that law enforcement's knowledge that the defendant did not have his own car and law enforcement's insistence that the defendant be driven to the police station in a police car supported finding that the defendant was in custody. *Id*.

The factor of location weighs against finding that defendant in this case was in custody. After the trooper called defendant, he arranged to come in for an interview. Defendant then drove himself to the state police post.

The duration of the questioning and the statements made during the interview are the next two factors to consider. *Id*. at 562. In *Barritt*, we agreed with the trial court's determination that a 90-minute interview was a neutral factor with regard to whether the interview was custodial. *Id*. at 569-570. The failure to tell the defendant that he is free to leave can contribute to finding that the interrogation was custodial. *Id*. at 570. However, in *People v Elliott*, 494 Mich 292; 833 NW2d 284 (2013), our Supreme Court held that law enforcement's failure to tell the defendant that he was free to leave when the interview took place in a jail library while the defendant was incarcerated was not dispositive or even compelling under the circumstances of that case. In *Barritt*, this Court distinguished *Elliott* because the defendant in that case was removed from a front lawn to the police station by law enforcement. *Barritt*, 325 Mich App at 570. We concluded that the statement factor weighed in favor of finding that the defendant was in custody. *Id*. This Court also considered the officer's statements and views during the interrogation to the extent that those views were manifested to the defendant and would have affected how a reasonable person would have understood whether he or she was free to leave. *Id*. at 571. In *Barritt*, we concluded that the accusatory nature of the questioning weighed in favor of determining that the interview was custodial. *Id*. at 573. We noted that law enforcement asked questions that law enforcement knew were reasonably likely to elicit incriminatory responses and the defendant's question about whether the interview was finished indicated that the defendant did not feel he was free to leave. *Id*. at 573-574. We also noted that law enforcement considered the defendant a suspect in the case as evidenced by the search warrant. *Id*. at 574.

The duration of the interview in this case does not weigh in favor of finding that defendant was in custody, and the statements do not either. Defendant's interview was approximately 90 minutes in duration, just like the interview in *Barritt*. Unlike the defendant in *Barritt*, however, the trooper interviewing defendant in this case told him from the onset that he was not under arrest and that he was free to leave at any time. Moreover, the detective testified that his method of interrogation did not involve yelling or raising his voice and our review of the interview videotape confirms this.

Whether the defendant was physically restrained and whether the defendant was released after the interview are two more factors to consider. *Id*. at 563. We have noted that, generally, the lack of the defendant being handcuffed weighs against finding that the defendant was in custody. *Id*. at 575. In *Barritt*, however, we held that the trial court did not clearly err by determining that the defendant was physically restrained even though the defendant was not handcuffed because the defendant was driven to the police station in a police car, the defendant was escorted to the police station by armed law enforcement officers, and the defendant was in the presence of armed law enforcement officers at all times. *Id*. at 575-578. The defendant's not being released after the interview also weighs in favor of finding that the interview was custodial. *Id*. at 579.

In this case, defendant was not physically restrained because he was not handcuffed, and unlike the defendant in *Barritt*, defendant was not escorted to the police station. And, as already mentioned, defendant was told at the onset of the interview that he was not under arrest and that he was free to leave at any time. Defendant set up the interview over the telephone and drove himself to the interview location. Defendant left the room to use the bathroom and voluntarily returned before being joined by the trooper and detective. Though both the trooper and detective appear to be wearing their service weapons, they remained holstered. And it appears that while the detective's chair was by the door, the door remained unlocked and defendant was aware from

what the trooper told him and his experience in leaving the room earlier that he retained the option to do so.

After considering whether the defendant's freedom of movement was restricted, whether there was a coercive environment must be considered. *Id*. at 580. Not all restraints on the defendant's freedom of movement create a custodial interrogation. *Id*. at 580-581. In *Barritt*, we determined that the same coercive pressures in play during the police station interview in *Miranda* existed in that case because the defendant was not free in any sense from the time law enforcement picked him up from the front lawn. *Id*. at 581-584. We noted that the defendant was always in the presence of an armed law enforcement officer, the defendant's dog was removed by animal control, and he was driven to the police station by law enforcement. *Id*. at 582-583. Additionally, we noted that the defendant did not arrange the interview's time, location, or tenor. *Id*. at 583. We further noted that the defendant was not told that he could leave the interview and that the interview became increasingly accusatory. *Id*.

Defendant in this case was not in a coercive environment because he arranged for his interview and was not subjected to the same consistently coercive and restrictive treatment as the defendant in *Barritt*. Defendant's contact with law enforcement initially occurred via telephone and he arranged an appointment to come in for the interview. Defendant drove himself to the post. Defendant was also told from the onset of the interview that he was free to leave at any time, and he was not restrained. The combination of these facts distinguishes this case from *Barritt*. We further reject defendant's arguments that the troopers wearing of their service revolvers, the location of the detective's chair, and the manner of the detective's questioning created a coercive environment. Moreover, we conclude that defendant's freedom of movement was not restricted, and because there was not a coercive environment, defendant would not have been entitled to have his statements after the detective entered the interview room suppressed.

Further, because defendant's argument that his confession should have been suppressed lacks merit, he cannot establish that counsel was ineffective for failing to file a motion to suppress it. Defense counsel is not required to make frivolous or meritless motions. *Knapp*, 244 Mich App at 386; *People v Fike*, 228 Mich App 178, 182; 577 NW2d 903 (1998); *People v Mayes*, 202 Mich Ap 181, 189-191; 508 NW2d 161 (1993).

Moreover, for an ineffective assistance of counsel claim to succeed, a defendant must also show that a different result would be reasonably probable but for his defense counsel's error. *Trakhtenberg*, 493 Mich at 56. In cases in which there is relatively little evidence to support a finding of guilt, the magnitude of error required to find prejudice is less than where there is greater evidence supporting a finding of the defendant's guilt. *Id*.

In this case, even if defendant's confession was suppressed, there was still overwhelming evidence to convict defendant of two counts of CSC-I against the victim. The victim testified that defendant sexually assaulted her regularly—approximately thirty times. The victim also testified that defendant told her not to tell anyone what had happened, and that he called her over and told her to pull down her pants. The assaults occurred in the victim's grandmother's living room, on an air mattress that defendant used as a bed, even though a nearby pull-out couch served as a bed for the victim and her sister. Moreover, defendant repeatedly admitted to sexual assaulting the victim in recorded telephone conversations with his mother, and defendant told his mother that

there were five assaults in three separate states.  Additionally, forensic analysis of defendant's cellular telephone revealed numerous pornographic sites accessed by defendant, demonstrating defendant's interest in sexual relations while "sleepwalking."  Therefore, it is not reasonably probable that a different result would have obtained even if defense counsel successfully obtained suppression of defendant's confession after the detective joined the interview in light of defendant's numerous, untainted admissions.

## B.  FAILURE TO REQUEST VOLUNTARINESS JURY INSTRUCTION

Defendant contends that his trial counsel was ineffective for failing to request an instruction that defendant's sexual assaults had to be the result of voluntary act in order for the jury to convict him.  We disagree.

"Failing to request a particular jury instruction can be a matter of trial strategy." *People v Dunigan*, 299 Mich App 579, 584; 831 NW2d 243 (2013).  However, "jury instructions must include all elements of the crime charged, and must not exclude from jury consideration material issues, defenses or theories if there is evidence to support them." *People v Thorne*, 322 Mich App 340, 347-348; 912 NW2d 560 (2017) (citation and quotation marks omitted).

Generally, to convict the defendant of a crime, both the *mens rea* and *actus reus* must be proven, but, when a crime is a strict-liability offense, only the *actus reus* must be proven.  *People v Likine*, 492 Mich 367, 393; 823 NW2d 50 (2012).  CSC-I with a child under 13 is a strict-liability crime.  See *People v Cash*, 419 Mich 230, 241-242; 351 NW2d 822 (1984).  "A defendant might defend against a strict-liability crime by submitting proofs either that the act never occurred or that the defendant was not the wrongdoer." *Likine*, 492 Mich at 393.  "Additionally, at common law, a defendant could *admit* that he committed the act, but defend on the basis that the act was committed involuntarily.[3]  *Id*.  "Examples of involuntary acts that, if proved, provide a defense against the *actus reus* element of a crime include reflexive actions, spasms, seizures or convulsions, and bodily movements occurring while the actor is unconscious or asleep." *Id*. at 393-394 (footnotes omitted).

During the initial portion of his police interview and in certain later recorded conversations with his mother, defendant said he was "sleeping" or "asleep."  Defendant explained that being asleep or sleepwalking rendered him incapable of recalling his actions.  Defendant now asserts that sexsomnia, sexual activity during sleep, is a recognized phenomenon and provides an

---

[3] Counsel's decision regarding the defense to be pursued is also a matter of trial strategy.  *People v LaVearn*, 448 Mich 207, 216; 528 NW2d 721 (1995) (determining that a counsel "faced with a choice between two defenses with significant evidentiary problems" may elect to pursue one over the other); *People v Strong*, 143 Mich App 442, 449; 372 NW2d 335 (1985).  And a reviewing "court cannot conclude that merely because a trial strategy backfires, effective assistance of counsel is denied." *Strong*, 143 Mich App at 449.

affirmative defense to the charges against him. Defendant notes that trial counsel argued this point to the jury, but performed deficiently by failing to request a jury instruction to support it.[4]

The prosecution counters that sexsomnia is a novel defense; therefore, "defense counsel's performance cannot be deemed deficient for failing to advance a novel legal argument." *People v Reed*, 453 Mich 685, 695; 556 NW2d 858 (1996). On the other hand, defendant notes that sexsomnia has been recognized in other jurisdictions and cannot be novel in light of our Supreme Court's discussion of the pertinent common-law legal principles in *Likine*. We are inclined to agree with the prosecution that whether sexsomnia exists[5] and, if so, whether it should be permitted to serve as a defense to individual acts occurring over an extended period when a defendant is aware of his condition present novel legal questions in Michigan. Badawy, *Sexsomnia: Overcoming The Sleep Disorder Defense*, 44-Mar Prosecutor 20 (2010); *Sexsomnia: A Valid Defense To Sexual Assault?*, 12 J Gender, Race and Justice 687 (2009).

However, even viewing defendant's claim as one involving an involuntary act committed during sleep, we conclude that defendant has not demonstrated that counsel's performance was deficient, and, even if he had, he has not shown that there is a reasonable probability of a different outcome. Defense counsel's failure to request a non-standard jury instruction that defendant's sexual assault must be voluntary was not deficient as the evidentiary basis for giving such an instruction to the jury was lacking. Putting it bluntly, defendant retracted his initial claim that he was sleepwalking, a state during which he could not recall engaging in a sexual act. Instead, consistent with the victim's testimony, defendant admitted to numerous conscious sexual assaults to the police, in great detail, and to his mother. Moreover, consistent with the victim's testimony that daytime sexual assaults occurred, defendant confessed to a daytime sexual penetration regarding one of the two sexual penetrations charged in this case. Furthermore, again consistent with the victim's testimony, defendant admitted to numerous sexual penetrations or touchings in three states over an extended period. Defendant also admitted to being sexually aroused by the victim's touches and to previously instructing the victim on how to touch him sexually. Plus, defendant viewed several pornographic materials, including two involving sexual relations while "sleepwalking." Given all of this, counsel's request for an instruction would have been without factual support and failed. *Knapp*, 244 Mich App at 386. And, even if we agreed that defense counsel's failure to request such an instruction was deficient, we conclude that defendant has not

---

[4] Counsel asked the jury to hold the prosecution to its burden of proof and examine the evidence to determine whether the sexual assaults occurred. Defense counsel argued that they did not because: (1) child victims are susceptible to others' influence, and, in this case, the victim increased the number of alleged assaults in Michigan from the two she initially reported to thirty, (2) the victim's medical examination was normal, despite the number and forceful nature of assaults she reported, and (3) defendant's confession to the police was unreliable. In one sentence, counsel mentioned that defendant maintained he was sleeping or "was in the process of thinking that this wasn't [the victim]."

[5] In 2014, the American Psychiatric Association added "sexsomnia" to the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition.

met his burden of demonstrating that a different outcome at trial was reasonably probable for the same reasons we have just discussed.[6]

Affirmed.

/s/ Anica Letica
/s/ Kirsten Frank Kelly
/s/ James Robert Redford

---

[6] Defendant's cumulative-error argument is also unavailing. Cumulative error occurs when the cumulative effect of several errors creates sufficient prejudice to require reversal, even when the errors individually would not merit reversal. *People v Dobek*, 274 Mich App 58, 106; 732 NW2d 546 (2007). Cumulative error requires actual errors to have occurred, and those errors must undermine the reliability of the jury's verdict. *Id*. For the reasons discussed earlier in this opinion, no errors actually occurred in this case; therefore, the cumulative-error claims also fails.