*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MAHER MOHAMMAD GHUNAIM,

        Defendant-Appellant.

UNPUBLISHED
November 17, 2022

No. 359167
Eaton Circuit Court
LC No. 21-020223-FC

Before: K. F. KELLY, P.J., and LETICA and RICK, JJ.

RICK, J. (*dissenting*).

I would reverse the trial court's order denying defendant's motion to suppress statements that he made to the police while hospitalized because defendant was subject to a custodial interrogation without being advised of his *Miranda*[1] rights and the prosecution failed to establish that his statements were voluntary. Accordingly, I respectfully dissent.

## I. BACKGROUND

This appeal arises from a recorded video interview between defendant, an immigrant from Jordan, and Detective Heather Stefan. At the time of the interview, defendant was hospitalized as a result of a suicide attempt.[2] Defendant was connected to an intravenous line (IV) and medical apparatus and confined to a hospital bed. Detective Stefan and LeeAnn Kinsey, an employee of Children's Protective Services, privately spoke with defendant in his hospital room after asking a "suicide watcher" to leave defendant's room.

---

[1] *Miranda v Arizona*, 384 US 436, 444-445; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[2] The majority refers to defendant's hospitalization as an "alleged suicide attempt." The prosecution never disputed that defendant was hospitalized as a result of a suicide attempt below and the record makes clear that at the time of the interview, defendant was under "suicide watch." Moreover, Detective Stefan testified that she was aware of defendant's history of attempted suicide and mental health issues.

The entire interaction was approximately one hour. Detective Stefan closed the hospital room door. She spoke with defendant for approximately 40 minutes, during which time defendant made incriminating statements. During the interview, defendant repeatedly sobbed and expressed suicidal ideations. Detective Stefan and Kinsey repeatedly told defendant that they were there to help him, but that they could not help him unless he told them what happened. Ultimately, defendant made incriminating statements favorable to the prosecution. Defendant subsequently filed a motion in the district court to suppress his statements. The district court granted the motion after an evidentiary hearing. Defendant was nonetheless bound over to the circuit court after his preliminary examination. Defendant again filed a motion to suppress in the circuit court, which the circuit court denied. This appeal followed.

## II. CUSTODIAL INTERROGATION

Defendant argues that evidence pertaining to his hospital interview with the police was inadmissible because he was interrogated while in police custody without having been read his *Miranda* rights. It is undisputed that defendant was interrogated. The majority concludes that defendant was not subjected to a *custodial* interrogation. I disagree.

"The ultimate question whether a person was 'in custody' for purposes of *Miranda* warnings is a mixed question of fact and law, which must be answered independently by the reviewing court after review de novo of the record." *People v Barritt*, 325 Mich App 556, 561; 926 NW2d 811 (2018) (quotation marks and citation omitted). However, "the trial court's factual findings concerning the circumstances surrounding statements to the police" are reviewed for clear error. *Id*. "A finding is clearly erroneous if, after reviewing the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." *Id*. (quotation marks and citation omitted).

The United States Constitution and the Michigan Constitution both protect the right against self-incrimination. US Const, Am V; Const 1963, art 1, § 17. In *Miranda v Arizona*, 384 US 436, 444-445; 86 S Ct 1602; 16 L Ed 2d 694 (1966), the United States Supreme Court established a procedural safeguard designed to offer additional protection for this right. "[T]he police must warn a defendant of his or her constitutional rights if the defendant is taken into custody for interrogation." *Barritt*, 325 Mich App at 561. "Statements made by a defendant to the police during a custodial interrogation are not admissible unless the defendant voluntarily, knowingly, and intelligently waives the constitutional right against self-incrimination." *Id*. at 561-562.

This Court has recognized that the term "custody" is a "term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Id*. at 562. The first step in determining whether a person was in custody is to consider whether "in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Id*. (quotation marks, citations and alteration omitted); see *People v Roberts*, 292 Mich App 492, 504; 808 NW2d 290 (2011) ("Custody must be determined on the basis of how a reasonable person in the suspect's situation would perceive his or her circumstances and whether the reasonable person would believe that he or she was free to leave."). However, when a defendant is physically unable to walk away from an officer, the proper analysis is not focused on whether the person was free to leave, but on whether the person was free to terminate the encounter. See *Florida v Bostick*, 501 US 429, 436;

-2-

111 S Ct 2382; 115 L Ed 2d 389 (1991) (holding that when a person's "freedom of movement was restricted by a factor *independent* of police conduct . . . . the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.") (Emphasis added).

"Whether an individual is effectively 'in custody' is based on the totality of the circumstances." *Roberts*, 292 Mich App at 505. When analyzing whether a person was in custody, "[t]he relevant circumstances are as follows: (1) the location of the questioning, (2) the duration of the questioning, (3) statements made during the interview, (4) the presence or absence of physical restraints during the questioning, and (5) the release of the interviewee at the end of the questioning." *Barritt*, 325 Mich App at 562-563 (citations omitted). No one circumstance controls. *Id*. at 563. "[T]he fact that the defendant was in the hospital does not automatically imply that the environment was coercive." *People v Kulpinski*, 243 Mich App 8, 25; 620 NW2d 537 (2000).

Here, I would conclude that under the totality-of-the-circumstances analysis, the trial court finding that defendant was not in custody was clearly erroneous. The majority concludes that the fact that defendant was interviewed in his hospital room weighs against a finding that defendant was in custody. While a hospital room is generally not a coercive environment, *id*., the majority discounts the circumstances of defendant's hospitalization and other facts. As recognized by the majority, defendant was hospitalized in Lansing on October 15, 2020, for a suicide attempt, and was ultimately transferred to Ascension St. John Hospital in Detroit on October 21, 2020, after he complained of chest pains. Detective Stefan interviewed defendant on October 22, 2020. Detective Stefan took concrete steps to create an environment akin to a more traditional police interrogation room. Before the interview began, Detective Stefan asked the additional person who was in the room—the parties agree that this person was a suicide watcher—to leave. Detective Stefan turned the lights on without asking for permission, further establishing that she, rather than the hospital or defendant, was in control of the environment. Detective Stefan then sat right next to defendant's bed while Kinsey stood at the foot of the bed. Neither one asked if defendant was comfortable with having them in such close proximity. Later, when a person knocked on the door, it was Detective Stefan who told them to come in—further signifying that she was the one in control of the room, not the hospital and not defendant. While it is not clear what that person was doing, Detective Stefan told the person to "go ahead," suggesting that the individual needed her permission to proceed. When another person attempted to enter the room, Detective Stefan said, "Can I ask you to maybe come back in a little bit?" The video of the interrogation demonstrates that, while framed as a request, this was a command. These facts, when considered together, make clear that during the interrogation, Detective Stefan was in charge of that room and everybody inside of it. Although the door to the room remained unlocked, this does not outweigh the fact that the questioning took place in an environment dominated by Detective Stefan.

The majority also concludes that "there was no evidence that Det. Stefan used defendant's condition or hospitalization as a tool to obtain his statements." However, the circumstances underlying defendant's hospitalization are paramount here. Detective Stefan acknowledged that defendant was receiving medical care, in part, because of his attempted suicide attempt. Moreover, Detective Stefan acknowledged that she requested the "suicide watcher" to leave defendant's hospital room before the interview, explaining that individuals on "suicide watch" are "not allowed to be alone." The recorded interview shows that defendant was immediately and consistently in

visible distress throughout the interview. He frequently sobbed and hyperventilated. Defendant repeatedly requested Stefan to shoot him. Despite this, the detective continued questioning defendant. Moreover, Detective Stefan acknowledged that defendant's request for her to shoot him may have indicated that defendant was not in a "very good state of mind." Detective Stefan also acknowledged that defendant had a history of suicide attempts and mental health issues. There was no indication that defendant was free to leave the hospital room, physically or medically. While Detective Stefan testified that defendant's IV was on "rollers," she did not know whether defendant could walk or get out of the bed. While she knew the circumstances of defendant's hospitalization, Detective Stefan did not inquire as to defendant's mental status or what medications, if any, defendant was being administered that could have affected defendant's comprehension. It is unlikely that a reasonable person, who was admitted to the hospital for a suicide attempt, transferred to a different hospital to treat his other medical issues, and under suicide watch, would feel free to leave the hospital room given the circumstances.

Moreover, there was evidence that proceedings against defendant had already begun at the time the questioning began. This further bolsters that Detective Stefan should have advised defendant of his *Miranda* rights. Throughout the interview, Detective Stephan interrogated defendant by asking questions and making statements that she knew were reasonably likely to elicit an incriminating response. At the motion hearing, Detective Stefan testified that she previously spoke to defendant's accuser, and she then spoke with defendant because he was a suspect in her criminal investigation. Early in the interview, it was clear that Detective Stefan was already convinced that defendant was guilty and just wanted him to confess. At the conclusion of the interview, Detective Stefan told defendant that she intended to submit a report to the prosecutor's office and that there was a good chance he would go to prison. Kinsey then informed defendant that she would be seeking termination of his parental rights; while this did not directly pertain to the criminal case, it provides further support for the conclusion that the government had already decided that defendant had committed the abuse of which he was accused and was initiating the appropriate proceedings. Given these circumstances, it is highly improbable that defendant felt free to terminate the encounter, and defendant was therefore entitled to be given the appropriate warnings. *Bostick*, 501 US at 436; *Barritt*, 325 Mich app at 574. Accordingly, I am left with a definite and firm conviction that a mistake has been made relative to the trial court's factual findings regarding custody. *Barritt*, 325 Mich App at 561.

### III. VOLUNTARY STATEMENTS

The majority also concludes that the trial court did not err by concluding that defendant's statements were voluntary. I disagree.

The prosecution has the burden of proving the voluntariness of a defendant's statement by a preponderance of the evidence. *People v Daoud*, 462 Mich 621, 634; 614 NW2d 152 (2000). "When reviewing a trial court's determination of the voluntariness of inculpatory statements, this Court must examine the entire record and make an independent determination, but will not disturb the trial court's factual findings absent clear error." *People v Shipley*, 256 Mich App 367, 372-373; 662 NW2d 856 (2003). A clear error occurs if the finding "leaves this Court with a definite and firm conviction that a mistake was made." *Id*. at 373.

-4-

The United States and Michigan Constitutions guarantee that a criminal defendant receive due process of law. US Const, Am XIV; Const 1963, art 1, § 16. "[T]he use of an involuntary statement in a criminal trial, either for impeachment purposes or in the prosecution's case in chief, violates due process." *People v Cipriano*, 431 Mich 315, 334; 429 NW2d 781 (1988). "Statements of an accused made during custodial interrogation are inadmissible unless the accused voluntarily, knowingly, and intelligently waived his or her Fifth Amendment rights." *People v Gipson*, 287 Mich App 261, 264; 787 NW2d 126 (2010).

"Whether a statement was voluntary is determined by examining the conduct of the police." *Shipley*, 256 Mich App at 373; see also *Daoud*, 462 Mich at 635 ("whether a waiver of Miranda rights is voluntary depends on the absence of police coercion"). In *People v Cipriano*, 431 Mich 315, 333-334; 429 NW2d 781 (1988), our Supreme Court held that the test of voluntariness is

> whether, considering the totality of all the surrounding circumstances, the confession is the product of an essentially free and unconstrained choice by its maker, or whether the accused's will has been overborne and his capacity for self-determination critically impaired. The line of demarcation is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession. [Quotation marks, citations, and alteration omitted.]

In assessing whether a statement is voluntarily, the trial court must consider, among other things, the following factors:

> the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

> The absence or presence of any one of these factors is not necessarily conclusive on the issue of voluntariness. The ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made. [*Id*. at 334 (citations omitted).]

For a confession to be involuntary, "there must be a substantial element of coercive police conduct" because "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *People v Wells*, 238 Mich App 383, 388; 605 NW2d 374 (1999) (quotation marks and citations omitted).

The United States Supreme Court addressed the issue of a hospital room interrogation in *Mincey v Arizona*, 437 US 385; 98 S Ct 2408; 57 L Ed 2d 290 (1978).

Mincey was brought to the hospital after [a] shooting and taken immediately to the emergency room where he was examined and treated. He had sustained a wound in his hip, resulting in damage to the sciatic nerve and partial paralysis of his right leg. Tubes were inserted into his throat to help him breathe, and through his nose into his stomach to keep him from vomiting; a catheter was inserted into his bladder. He received various drugs, and a device was attached to his arm so that he could be fed intravenously. He was then taken to the intensive care unit.

At about eight o'clock that evening, Detective Hust of the Tucson Police Department came to the intensive care unit to interrogate him. Mincey was unable to talk because of the tube in his mouth, and so he responded to Detective Hust's questions by writing answers on pieces of paper provided by the hospital. Hust told Mincey he was under arrest for the murder of a police officer, gave him the warnings required by *Miranda v. Arizona*, and began to ask questions about the events that had taken place in Mincey's apartment a few hours earlier. Although Mincey asked repeatedly that the interrogation stop until he could get a lawyer, Hust continued to question him until almost midnight. [*Id*. at 396 (citation omitted).]

The Supreme Court stated that it was "hard to imagine a situation less conducive to the exercise of a rational intellect and a free will than Mincey's." *Id*. at 398 (quotation marks omitted). The Court emphasized that Mincey was nearly in a coma; the questioning took place only a few hours after the injuries were inflicted; he described his leg pain as "unbearable;" he was confused and provided incoherent answers; his body was "encumbered by tubes, needles, and a breathing apparatus;" and he asked for the interrogation to end and requested a lawyer. *Id*. at 398-401.

This Court recently addressed a similar issue in *People v Posey*, 334 Mich App 338, 365, 368; 964 NW2d 862 (2020). We concluded that a defendant's hospitalization with serious injuries and use of pain medication is not alone sufficient to render a statement involuntary. In *Posey*, the defendant was interviewed by police the day after he was hospitalized and operated on for a gunshot wound. The defendant relied on *Mincey* for the proposition that his statements were involuntary. *Id*. at 364, 366. The defendant argued that the statements were involuntary because he "was experiencing some pain from his injuries and was affected by his pain medication." However, this Court nonetheless concluded that there was "no indication that his condition was so debilitating as to make him lose his free will." *Id*. at 366. This Court emphasized that the defendant was "alert and articulate;" there was "no sign that he was impaired by any medication during the interview;" he never requested to end the interview; "he was alert and conscious the whole time;" and there was "no evidence that [his] mental condition was significantly compromised or diminished." *Id*. at 366-367. This Court also noted that the interview lasted only 25 minutes and the defendant "initially lied to the police." *Id*. Additionally, the defendant waived his *Miranda* rights. *Id*. at 366.

In *People v Peerenboom*, 224 Mich App 195, 197; 568 NW2d 153 (1997), the defendant was hospitalized after allegedly participating in a bombing. The defendant argued that her statements were involuntary and suppression was required because the police officers failed to provide her with *Miranda* warnings. This Court rejected the defendant's argument because the treating physician testified that the defendant's medication "did not reduce her willpower or impair

her ability" to refuse to answer. The interviews were brief, the defendant "was generally able to respond intelligently to questioning," and "she had the presence of mind to lie" to the police. *Id*. at 198-199. These factors, according to the Court, supported the trial court's finding of voluntariness. *Id*. at 199. The Court also concluded that defendant had not been arrested and no formal restraint was placed on her freedom of movement. *Id*. at 198.

The instant case is distinguishable from *Posey* and *Peerenboom*. In those cases there was no indication that the police took any measures to exploit the defendant's condition. In the instant case, defendant was in a weakened, vulnerable state. One reasonable conclusion is that the police took objective measures to use defendant's condition and obtain his confession. As discussed earlier, regardless of her intent, Detective Stefan created a hostile, coercive environment, and she did not inform defendant of any of his rights. Moreover, Detective Stefan was clearly aware of defendant's vulnerable state and the circumstances of defendant's hospitalization.[3] Based on the record, defendant was in the hospital because he had attempted suicide. Throughout the interview it was clear that he was in severe emotional distress. For example, defendant began to cry within the first two minutes of the interview. There were also points when he sobbed uncontrollably, hyperventilated, and even asked Detective Stefan to shoot him. Therefore, unlike in *Posey*, 334 Mich App at 366-367, there was evidence that defendant's mental condition was "significantly compromised or diminished." The majority concludes that the video recording "does not demonstrate that defendant was in way compromised" and that it was defendant's "choice to be in the hospital." Upon my review of the video, I could not reach such a conclusion for the reasons already explained. Moreover, the record is silent as to whether defendant was voluntarily or involuntarily hospitalized as a result of the suicide attempt. The record does, however, indicate that defendant was under supervision by a "suicide watcher". In my opinion, this supports a finding that defendant was not free to leave the hospital room and that defendant's statements were not voluntary.

Detective Stefan capitalized upon defendant's emotional distress by telling him that there was help available and that she was there to help him. She then conditioned this help on his cooperation. For example, when defendant said that he had lost everything, Detective Stefan told defendant that everything was out of his grasp but that he could get it back by cooperating. Additionally, Detective Stefan mentioned defendant's daughter numerous times throughout the interview. She intimated that he needed to confess if he wanted to ever see her again. As noted,

---

[3] I encourage the majority to consider cases of confessions elicited from defendants who struggle with mental illness and disabilities, which have led to the wrongful incarceration (and exoneration in some cases) of innocent criminal defendants. For example, Eddie Joe Lloyd was incarcerated for 17 years before he was exonerated. Lloyd was found guilty, in part, based on a confession he gave to police while he was institutionalized in a psychiatric hospital. See Rogal, *Protecting Persons with Mental Disabilities from Making False Confessions: The Americans With Disabilities Act as a Safeguard*, 47 NM L Rev 64, 70 (2017); see also The National Registry of Exonerations, *Eddie Joe Lloyd* <https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3387> (accessed October 25, 2022).

Kinsey was also present and assisted in the questioning. More generally, throughout the interview Detective Stefan repeatedly told defendant that she was there to "help" him and that she would be able to help him if he was "honest" and told her what happened. However, it became clear at the end of the interview that Detective Stefan had no genuine intention of helping defendant. For example, when defendant asked how she was going to help him, she only gave a vague answer about getting substance abuse treatment in prison. More generally, Detective Stefan at times seemed to convey that defendant had no choice but to cooperate with her and be truthful. For example, when defendant stated that he could not remember something, Detective Stefan retorted that he was not being honest.

I also recognize that there are some relevant factors which either weighed in favor of the trial court's finding or were not applicable. The parties agree that defendant was 40 years old, and there is no reason to believe that his age left him susceptible to coercive tactics. Defendant had some prior experience with law enforcement, half of which resulted from prior suicide attempts. The questioning lasted approximately one hour, but defendant began making incriminating statements shortly after it began. There was no evidence pertaining to defendant's education level, but he appeared to at least be intelligent enough to understand what was happening. However, English is not defendant's primary language. Defendant appeared alert, he spoke coherently, and he appeared to understand what was happening. There was also no evidence that defendant was deprived of food, sleep, or obvious medical attention, and defendant was not physically abused.

Nonetheless, when viewing the totality of the circumstances, I would conclude that the evidence established that the police interrogated defendant while he was in a delicate and vulnerable state. Defendant's confession was a byproduct of his diminished capacity. Although I recognize that this case is subject to the highly deferential "clear error" standard of review, the prosecution failed to meet their burden of proof on this record. See *Daoud*, 462 Mich at 634; *Cipriano*, 431 Mich at 334. I am left with "a definite and firm conviction that a mistake was made." *Shipley*, 256 Mich App at 373. I would hold that the trial court clearly erred by finding that defendant's confession was voluntary and by denying his motion to suppress. I would reverse the trial court's order.

For the reasons explained, I respectfully dissent.

/s/ Michelle M. Rick

-8-