*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee/Cross-Appellant,

v

HUNTER WILLIAM LOCKE-HUGHES,

        Defendant-Appellant/Cross-Appellee.

UNPUBLISHED
June 24, 2026
9:22 AM

No. 370473
Macomb Circuit Court
LC No. 2022-2126-FC

Before: YOUNG, P.J., and BORRELLO and TREBILCOCK, JJ.

PER CURIAM.

Defendant, Hunter William Locke-Hughes, appeals as of right his convictions for first-degree child abuse, MCL 750.136b(2), and involuntary manslaughter, MCL 750.321, of six-year-old Terrance, who died under Locke-Hughes' supervision. Locke-Hughes argues that the evidence was insufficient to convict him of first-degree child abuse, that his trial counsel was ineffective, and that he was denied the right to a fair trial. The prosecution filed a cross-appeal, arguing that the trial court abused its discretion in issuing a sentence that departed downward from the recommended minimum sentencing guideline. We vacate Locke-Hughes' convictions and remand for a new trial.

## I. FACTUAL BACKGROUND

Ashlynn Bethell was mom to two children, Terrance and E, who was four years younger than Terrance. When Terrance and E were born, Bethell was dating and living with their father, Gary Adams.

When Terrance was born, he was diagnosed with a genetic disorder called CHARGE syndrome and was severely disabled. He spent the first three months of his life in the hospital. Bethell testified that, even after they brought Terrance home, they were "in and out" of the hospital because he was "very sick." In describing Terrance's illness, Bethell testified that Terrance had

-1-

upper-airway issues and would aspirate when he ate, so he had a feeding tube inserted at just a few months old. Bethell pureed his food. Feeding would take about five to ten minutes depending on the day Terrance was having; sometimes he would become emotional and throw up.

Terrance wore hearing aids, was visually impaired, and could not communicate verbally. Because Terrance was nonverbal, he would point to things that he wanted. One of his eyes was small, and he had facial palsy on half of his face. Terrance had a flat forehead with a prominence on each corner, which looked like bruising due to its discoloration. He also lacked cartilage in his ears, making them appear abnormal. Terrance had a weak immune system. He would get congestion that would turn into pneumonia or RSV. Terrance also had some heart issues, but these were not as significant as his other medical needs. Terrance could walk, but he was unstable and tripped easily. Terrance was not potty trained.

Terrance loved bathtime. Bethell would give him a bath after dinner, before bed. Bethell could not recall how many times a week she would bathe Terrance, but she would bathe him if he threw up on himself. Terrance would usually reach for her hand or wait for her to help him get in the tub so he would not slip. He also needed help getting out of the tub. Terrance was capable inside the tub, where he loved to splash and play. If there was no water in the tub, he could get in and out by himself. Terrance was okay to be alone in the bathtub while Bethell would do other things, periodically checking on him. She would put about six inches of water in the bathtub, and Terrance liked to lay on his back in the tub.

## CPS Becomes Involved With The Family And Bethell Begins Dating Locke-Hughes

Bethell and Adams broke up in January 2021, and Bethell and her children moved in with Bethell's mother. Bethell had shared custody with Adams and described their relationship as "rocky." Bethell's mother and Adams' mother would help watch the kids while Bethell was working the night shift at Domino's Pizza. Bethell met Locke-Hughes at Domino's, and they began dating in spring 2021. He was 19 and she was 26. After a few months of dating, Bethell introduced Locke-Hughes to her kids. The four of them would go to the park and play in the house together.

In June 2021, Bethell moved into the subject apartment with both of her kids. Children's Protective Services (CPS) became involved with their family around this time because Terrance broke his arm. According to Bethell, she had taken Terrance to the hospital because his arm was bothering him, and CPS became involved as a result. The assigned CPS caseworker later testified that, based on the allegations of a fractured arm and facial injury, she first went to Bethell's home to meet with her, Terrance, E, and Locke-Hughes. Locke-Hughes confirmed he was not living in the apartment at this time. CPS also interviewed Terrance's grandparents and his father, Adams. CPS did not have enough evidence to indicate intentional physical abuse but did substantiate improper supervision against Bethell. A case was opened on this basis and CPS remained in touch with the family to help provide services.

Shortly thereafter, in August 2021, Bethell took Terrance to the hospital again for a bruised eye, triggering another CPS investigation. Because these incidents happened so closely in time, a temporary voluntary arrangement was implemented, in which Terrance was placed with his paternal grandmother for a couple weeks. E continued living with Bethell. Bethell was allowed to visit Terrance a couple times per week, but with supervision from his grandmother or his grandmother's husband, who also lived in the home. Locke-Hughes never came with her on these visits. After Terrance returned to Bethell's care, services were recommended for Terrance's self-harming behaviors. Specifically, according to Bethell, Terrance would hit himself when he was upset by knocking his knees together or hitting his head into walls or with his tablet. CPS never observed Terrance self-harming. CPS was again unable to substantiate intentional physical abuse.

In the fall of 2021, Locke-Hughes began spending the night at Bethell's apartment and moved in around September or October of that year. CPS was still involved with Bethell, including daily check ins on the phone or via text, but was never notified that Locke-Hughes moved in. The CPS caseworker later testified that during the seven or eight times she made in person visits to the home, she had no concerns of the kids "being in distress or hav[ing] any issues."

When Locke-Hughes moved in, he was working as a plumber during the daytime five or six days a week, while Bethell was still working nights. Bethell always took the kids to family members' homes to babysit while she was working. The family members would never come to watch the kids at Bethell's apartment. At some point, Locke-Hughes began picking the kids up from Bethell's mother's house after dinner, but before bedtime, three or four times a week. He was not giving the kids baths during this time. Sometimes he would feed them. Bethell later testified that Locke-Hughes would "help [her] with whatever [they] needed help with when [they] were home."

Around November 2021, Terrance went to the hospital again for injuries to his head and eyes. CPS conducted another investigation but did not substantiate physical abuse or improper supervision. CPS put a safety plan in place that required Bethell to report any new injuries immediately to the caseworker. Part of the safety plan instructed Bethell to not leave her children alone with Locke-Hughes, which she later testified that she adhered to "as best as [she] could." The CPS caseworker explained that the reason for this requirement was because of Terrance's special needs, which CPS did not believe Locke-Hughes, who had no special training, was equipped to handle at his young age. Once the safety plan was put in place, Bethell stopped having Locke-Hughes pick up the children from her mother's house and Locke-Hughes was not left alone with the children. CPS visited Bethell's apartment three times per week to check on the children.

**The Day Of Terrance's Death**

During the daytime on December 28, CPS came to the apartment for a meeting with Bethell and her children, which Bethell later testified "went well." CPS still did not know that Locke-Hughes had moved in. CPS also did not notice anything out of the ordinary during that

-3-

meeting or any injuries to Terrance. Bethell was scheduled to work her usual night shift that evening. Though Bethell's mother was supposed to babysit, she cancelled due to illness. Bethell asked Adams, his mother, and a couple other family members to babysit instead, but no one was available. Bethell told Locke-Hughes of the situation, and he offered to babysit, though he had never watched the kids for an entire work shift. Still, Bethell trusted Locke-Hughes to be alone with her children. When Bethell was asked at trial if she felt that Locke-Hughes was "perfectly capable of taking care of Terrance" at that time, she responded, "yes." As Locke-Hughes arrived at the apartment, Bethell rushed out to work. Bethell had just fed Terrance and she expected Locke-Hughes to bathe him.

As Bethell was pulling out of the parking lot in her car to head to work, Locke-Hughes called her. He told Bethell that Terrance had become very upset when she left and threw up. According to Bethell, Locke-Hughes had been around Terrance before when he threw up but had never been alone when it happened and never had to clean it up by himself. Bethell testified that she offered to turn around and come home, but Locke-Hughes told her not to, so she continued driving to work.

About 15 minutes later, she received another call from Locke-Hughes. Bethell described Locke-Hughes as "very panicked and freaking out a little bit that [Terrance] had pooped in the bathtub." He was asking for help, did not know what to do, and indicated that he put Terrance on a towel on the couch, like Bethell would do. Bethell was worried and considered coming home, but Locke-Hughes told her, "I got this," so she continued driving to work. Bethell later testified that she felt a sense of relief that Locke-Hughes would take care of things.

Bethell received a third phone call from Locke-Hughes as she pulled into the parking lot for work. Locke-Hughes was "hysterical" and told Bethell that Terrance was not breathing. Bethell asked if he was doing CPR, Locke-Hughes replied that he was. She instructed him to call 911 and testified that she was surprised he called her before doing so.

Locke-Hughes did call 911, and Clinton Township Police Officer Nicholas Wagner arrived. Wagner entered a bedroom and saw Locke-Hughes and Terrance; Terrance was lying face up on the carpet. Terrence did not appear to be breathing and was unresponsive. Wagner observed a bump or swelling on Terrance's forehead and mucus or film on his face. Wagner also observed vomit in the bathtub and on the bathroom floor as well as feces in the bathtub and on the bathmat. Locke-Hughes appeared scared, was shaking, and even asked Wagner to hold his hand for comfort. The Clinton Township Fire Department firefighters arrived and started rendering aid to Terrance. MedStar arrived shortly afterwards to assist. Wagner's body cam footage was played for the jury. Wagner described that "people were all over" in the apartment and that looking back on it, he would have kept everyone out of the bathroom, bedroom, and away from the towel on the floor to protect the scene.

Clinton Township Firefighter and certified paramedic Ryan Clark was also on scene and performed CPR and employed a bag-valve mask to ventilate Terrance. Terrance's jaw was

clenched, which Clark thought was odd, and an endotracheal tube could not be inserted. There was also some fluid that came out of his mouth that had to be wiped off. MedStar and EMT personnel arrived on the scene during this time. Terrance was hooked up to the EKG monitor and his heart was in asystole.[1] He was given three rounds of epinephrine injections, but the injections failed to jump start Terrance's heart. Terrance was then transported to the hospital where there were more tools to revive him.

Clinton Township Firefighter and certified paramedic Brett Elliott was also on scene. Locke-Hughes explained to Elliot that E found Terrance in the bathtub and that Locke-Hughes "rushed in, pulled him out and then he stated that he started CPR." Elliott described Terrance as appearing pale with vomit on his face and chest. He also observed a contusion on Terrance's forehead. Elliot assisted with CPR on Terrance and confirmed Terrance's heart was in asystole and their treatment was unable to reverse it.

Tiffani Haught testified she was a paramedic with MedStar Ambulance on the night of Terrance's death. When she arrived at the apartment and entered the bedroom, firefighters were performing CPR on Terrance and a police officer was also there with Locke-Hughes in the corner of the room. Terrance was hooked to a cardiac monitor and in asystole. Haught was informed that Terrance had a downtime[2] of five minutes or less. Haught found it odd that Terrance had drowned in the bathtub because usually bathtub drownings are most common among infants and young toddlers; "statistically six[-]year[-]old[s] are not associated with tub drownings." Haught emphasized the rigidity in Terrance's jaw. According to Haught, this was unusual, as people experiencing cardiac arrest typically have very pliable jaws. Haught explained that rigor mortis, the tightening of the jaw that Terrance had exhibited, usually presents after an hour or more of a patient being in cardiac arrest. It can set in faster, however, in warm temperatures or warm water. Haught explained that these lack of "normal" drowning findings and "inconsistencies started to pile up for [her]." She observed fluid in Terrance's mouth, and coming from his ears and nose that "looked like a mixture of water and his tube feed." Considering all the efforts to resuscitate Terrance, Haught was surprised that a pulse could not be reestablished based on the amount of time Terrance was allegedly drowning.

Clinton Township Police Sergeant Steven Vasilides and Clinton Township Police Officer Klajdi Dallo responded together to the scene. Both officers were trained to use a digital scanner

---

[1] Cleveland Clinic, *Asystole* <https://my.clevelandclinic.org/health/symptoms/22920-asystole> (accessed April 28, 2026) ("Asystole is when your heart's electrical system fails, causing your heart to stop pumping. This is also known as 'flat-line' or 'flat-lining' because it causes your heart's electrical activity to look like a flat line on an electrocardiogram. Without immediate CPR or medical care, this condition is deadly within minutes.")

[2] Haught explained that the term "downtime" refers to how long an individual has been in cardiac arrest.

that takes measurements of rooms to recreate a three-dimensional version of a scene. There were feces in the bathtub, which had 6 inches of water in it at the time the measurement was taken. Vasilides testified later that there was likely more water in the bathtub before but that some had been drained.[3]

In the meantime, Bethell drove home from work. During that time, she called Locke-Hughes to ask what was going on. Locke-Hughes told Bethell that Terrance went back into the bathtub on his own. Bethell was very concerned by Locke-Hughes' account of what happened, as she had never observed Terrance getting into a bathtub that was filled with water on his own. When Bethell got home, medical personnel were "working on" Terrance and there were "people everywhere." Bethell could not approach Terrance at that time.

Bethell walked around the apartment and she entered the bathroom. She testified that she flipped the drain in the bathtub "because there was poop floating in the water and [she] was just walking around freaking out." She observed feces all over the bathroom rug and in the bathtub. She was surprised that Terrance had defecated in the tub, as he had never done that before. Bethell was also surprised by the amount of water that was in the bathtub, as she did not believe it was the amount she typically put in. However, on cross-examination, Bethell did not dispute that the police measured 6 inches of water in the tub that evening—the same amount that Bethell testified she would usually put into the bathtub.

Bethell eventually went to the hospital to see Terrance. She noticed that Terrance's two front teeth were knocked out, but she did not observe any other injuries to his face. Terrance was pronounced dead within 10 minutes of arriving at the hospital. Following Terrance's death, Bethell and Locke-Hughes stayed together, and she relied on him for emotional support. It was not until he was arrested in 2022 that they broke up.

**Law Enforcement Investigates The Circumstances Of Terrance's Death**

Medical Examiner Investigator for both Macomb and Oakland counties, Jennifer Skridulis, was immediately notified of Terrance's death and went to the hospital. She obtained Terrance's medical records and two of his teeth that were placed into a bag. Skridulis took photos of Terrance's body, which show much of his body covered by a brown substance. After leaving the

---

[3] Wagner recalled that at some point the drain to the bathtub was opened, and that he instructed Locke-Hughes to "stop draining the tub" because he knew that law enforcement would "want to analyze everything in the apartment." Both Locke-Hughes and Bethell were in the bathroom at the time with him. Bethell clarified at trial that she was the one that flipped the drain, not Locke-Hughes.

-6-

hospital, Skridulis went to Bethell's apartment. The evidence technicians were taking photos of the scene, and Skridulis took some photos of it herself too.

Bethell's CPS caseworker was notified of Terrance's death the evening of December 28 and went to the apartment the following day for an in-person meeting with Bethell. In the apartment during the meeting was Bethell, her sister, Locke-Hughes, his mother, and stepdad. The CPS caseworker described Locke-Hughes as compliant, but not expressing much emotion. E was removed from Bethell's custody and placed with her grandmother. CPS initially sought to terminate Bethell's parental rights to E, but it eventually dropped termination from the petition and issued a parenting agency agreement.[4]

Macomb County Medical Examiner Dr. Mary Pietrangelo performed an autopsy on Terrance on December 29. The hospital told Pietrangelo that Terrance had CHARGE syndrome, which she had never heard of before, so she reviewed a one-page summary that she found herself for background. Pietrangelo also reviewed the hospital emergency room records, fire department records, police reports, MedStar reports, medical records from Terrance's treating physicians, and photos from the apartment.

Pietrangelo found no esophageal abnormalities in Terrance and did not believe his CHARGE syndrome contributed to his death. Instead, Pietrangelo identified Terrance's cause of death as drowning, with the manner of death indeterminate. She identified injuries to his mouth but concluded they resulted from medical intervention and did not relate to the cause of death. She also noticed the bruise on Terrance's forehead but concluded that it was part of his facial bone structure. During Pietrangelo's internal examination of Terrance's brain, she observed a number of injuries on the underside of his scalp that corresponded with some bruises on the outside of his scalp. There was a small spot of fresh bleeding on the back of the brain on left side behind the ear that she stated would have been caused by Terrance's head jolting from side to side, shifting his brain. Pietrangelo also observed fresh hemorrhage to Terrance's right shoulder blade, back trunk area, and left shoulder blade, and concluded that these injuries were not related to CPR efforts. She also observed fresh hemorrhage in the soft tissues around the tenth, eleventh, and twelfth lower ribs, fresh abrasion on the left lower chest, and fresh hemorrhage in the sacral area. These injuries were also consistent with blunt force trauma due to his body impacting the sides or bottom of the bathtub.

Pietrangelo also performed an interior examination of Terrance's neck. She found fresh hemorrhaging in the right and left neck muscles consistent with blunt force trauma but no exterior marks on the skin of the neck. Terrance's lungs were hyperinflated, consistent with a drowning death. Pietrangelo did not find water in his lungs, but indicated aspiration of stomach contents can result in death. Pietrangelo also later testified that a person in the dying process

---

[4] E and Bethell were reunited in September 2023 and the CPS case against her was closed out.

often loses control of their bowels and urine. She stated that finding defecation in the bathtub would be consistent with dying in the bathtub, although feces were also found outside the bathtub as well.

**Law Enforcement Focuses Its Investigation On Locke-Hughes**

Detective Thomas Hill of the Clinton Township Police Department responded to the scene on December 28 as well and was assigned as officer in charge of investigating Terrance's death. After obtaining a warrant, he searched Bethell's apartment and seized both her and Locke-Hughes' cell phones. Clinton Township Police Detective Joseph Burns extracted data from Locke-Hughes' cell phone. The analysis revealed that on December 28, Locke-Hughes had an incoming FaceTime video call from Bethell at 5:55 p.m., lasting four minutes and thirty-three seconds. Locke-Hughes next made a standard phone call to Bethell at 6:07:41 p.m., lasting fifty seconds. He called Bethell again at 6:23:18 p.m., for six minutes and nine seconds. Locke-Hughes then made a twenty-six-second-long Facetime video call to Bethell at 6:31:07 p.m. Locke-Hughes called 911 at 6:31:48 p.m. for six minutes and forty-one seconds. Finally, Locke-Hughes received a standard phone call from Bethell lasting one minute and twenty-five seconds at 6:39:22 p.m.

That same evening, Hill left Bethell's apartment around 9:35 p.m. and requested that Locke-Hughes be transported to the police station for an interview. Locke-Hughes agreed, and Officer Wagner drove him to the police station. The interview was conducted by Hill and his supervisor, Sergeant Simon, and was audio and video recorded, later played in full for the jury. At the start of the interview, Hill told Locke-Hughes that he was not under arrest and that he was free to leave at any time. Locke-Hughes nodded in agreement and replied that he just wanted to help. The officers proceeded to ask primarily open-ended questions to Locke-Hughes, who shared his version of the story from that evening. Locke-Hughes detailed his relationship with Bethell and her kids, generally explained how much he helped out and cared for them, and emphasized that he never physically harmed either of Bethell's children. According to Locke-Hughes, Terrance's death was an accident. Locke-Hughes walked into the bathroom to find that Terrance defecated in the bathtub. Locke-Hughes removed Terrance to clean him up and to call Bethell, and while he was on the phone with Bethell, Terrance returned to the bathroom, climbed into the tub and drowned to death.

At the end of the interview, Locke-Hughes thanked the officers for responding so quickly to the scene that evening and gave them his contact information in case they needed anything further from him while conducting their investigation. Locke-Hughes was free to leave when the interview ended. Law enforcement kept his phone for processing pursuant to the warrant.

On April 6, 2022, Hill received Terrance's autopsy report. He contacted Locke-Hughes and asked him to come to the police station so Hill could return Locke-Hughes' cell phone and to process and to discuss the findings in the report. That same day, Locke-Hughes came in for his second interview. Hill testified that Locke-Hughes was not under arrest at this time, came voluntarily with his stepdad, and did not have counsel. However, Hill did not inform

-8-

Locke-Hughes that he was not under arrest, that he was free to leave, or that he was entitled to counsel. This interview was audio and video recorded and later played for the jury in full. Detective Jeff Bishop was also present for the interview and participated in questioning Locke-Hughes.

Hill's testimony at trial noted inconsistencies in Locke-Hughes' statements between the two interviews. In the second interview, Locke-Hughes said he saw Terrance defecate in the bathtub, but in the first interview he said that Terrance had already defecated in the bathtub when Locke-Hughes entered the bathroom. During the interview, Hill gave Locke-Hughes a doll to simulate what happened exactly during Terrance's bath the night of his death. "When [Locke-Hughes] physically held the facsimile doll down, he held it down originally, and then he stuck his two fingers behind the facsimile doll's head, as if he was propping up [Terrance's] head." However, when defense counsel on cross-examination asked, "[Locke-Hughes] never one time told you that he put Terrance's head under water?" Hill replied, "I believe that's correct." Again, counsel asked, "[Locke-Hughes] never made an admission that he put [Terrance's] head under water, true?" Hill replied, "He never made an admission that he put his head under water, no."

Our review of the interview video revealed a slightly more nuanced, and ultimately more incriminating, discussion between the officers and Locke-Hughes. To start, this interview, unlike the first, consisted primarily of leading questions and the officers providing their version of what happened to Terrance. The officers frequently referenced the concepts of "god," "redemption," and "forgiveness," and encouraged Locke-Hughes to tell the truth to relieve himself of the guilt they presumed he was carrying. Hill conceded that the second interview was structured differently than the first interview because of the "information that had come to light." Setting aside the nature of the second interview, the following exchanges took place:

*Hill*: How long did you hold him underwater? One minute? Two minutes? How long did you hold him underwater?

*Locke-Hughes*: I never held him under the water.

\* \* \*

*Hill*: How long?

*Locke-Hughes*: I never put his head underwater.

*Hill*: What did you put under water?

*Locke-Hughes*: I had his body in the water, but I made sure his head was not in the water.

-9-

*Hill*: That's not an accurate statement.

*Locke-Hughes*: That's what I did.

*Hill*: Were you holding him down?

*Locke-Hughes*: Yeah.

*Hill*: How were you holding him down?

*Locke-Hughes*: With his shoulders. But I never put his head under the water.

\* \* \*

*Hill*: Was [Terrance] fighting you at all?

*Locke-Hughes*: Not really at all.

\* \* \*

*Hill*: How long were you holding him there?

*Locke-Hughes*: No longer than 30-45 seconds.

\* \* \*

*Hill*: How long did you hold him down with his head under the water?

*Locke-Hughes*: I did not put his head under the water?

\* \* \*

Hill then asked Locke-Hughes to demonstrate how he was holding Terrance, which he did. Hill then continued:

*Hill*: were you frustrated with him?

*Locke-Hughes*: I wasn't frustrated with him. I never get frustrated with him.

*Hill*: But what was the reason you were holding his shoulders down?

*Locke-Hughes*: I really – I don't know.

\* \* \*

*Hill*: Why were you holding him down in the water like that?

*Locke-Hughes*: Because he didn't like being washed . . . . and I had to get the soap off of him.

\* \* \*

*Hill*: is there a period of time while you were trying to get him washed off . . . that you lost your sense of what was going on and you don't remember why you held him under water?

*Locke-Hughes*: It's possible.

*Hill*: Was it an accident that you held him under water for as long as you did?

*Locke-Hughes*: Yes.

*Hill*: And how long do you think that was?

*Locke-Hughes*: It couldn't have been longer than 45 seconds.

Hill also asked Locke-Hughes if it's possible that he "blacked out" and didn't remember what happened, to which Locke-Hughes replied, "it's possible." Also, when Hill asked Locke-Hughes if Terrance pooped before or after Locke-Hughes held him down, Locke-Hughes replied, "I'm not sure," in contrast with the timeline of events from his previous iterations. Bishop then took over to ask Locke-Hughes questions. Bishop recited the events as he understood them, including that Locke-Hughes held Terrance down for "45 seconds, maybe 2 minutes" as Locke-Hughes nodded his head in agreement. He continued:

*Bishop*: Is it fair to say that while [Terrance] was struggling is when he went to the bathroom in the tub?

*Locke-Hughes*: It's fair to say that, yeah.

*Bishop*: Is that what happened?

*Locke-Hughes*: I honestly couldn't tell you when he went to the bathroom in the tub . . .

-11-

As the interview neared the end, Hill informed Locke-Hughes that his investigation would continue and that he would be in touch after consulting with the prosecutor's office. Locke-Hughes asked, "what for?" As Hill was explaining that because Terrance died, subsequent criminal charges would follow, Bishop cut him off to clarify, "Maybe. Potentially. There *could* be." Bishop elaborated, explaining that the prosecutor's office is the ultimate decision maker regarding whether charges are warranted. Before leaving, Hill grabbed the cell phone belonging to Locke-Hughes that was already in their possession, confirmed that Locke-Hughes had an alternative phone to use, and told him that they needed to keep his phone longer—despite originally telling Locke-Hughes that they would be giving it back to him that day. The interview ended and Locke-Hughes went home. The next day, Locke-Hughes was arrested and charged with first-degree child abuse and felony murder.

**Locke-Hughes' Jury Trial And Subsequent Proceedings**

Prior to trial, Locke-Hughes filed a motion to quash, arguing that his statements made during the April 6 interview should be excluded from evidence at trial because they were made in a custodial environment without being advised of his *Miranda*[5] rights. The trial court heard and denied the motion, holding that Locke-Hughes was not subject to a custodial interrogation on April 6, and therefore *Miranda* warnings were unnecessary.

The trial court order applied a totality of the circumstances test using the factors set forth in *People v Barritt*, 325 Mich App 556; 926 NW2d 811 (2018). Its analysis emphasized that Locke-Hughes went to the station voluntarily on April 6, that Hill told Locke-Hughes the interview would end shortly, and discussed the general appearance of the room, including its size and that it was well lit. The trial court noted that the officers were armed but did not make "any threatening moves or gestures toward their weapons." It mentioned Locke-Hughes' age of 20 years old, but then continued, "[t]he video recordings do not suggest [Locke-Hughes] was unable to appreciate the gravity of the situation." The trial court then considered duration, concluding the time here suggested no custodial environment. It further mentioned that Locke-Hughes left at the end. Finally, the trial court stated:

> Detectives Bishop and Hill plainly disbelieved [Locke-Hughes'] version of the events surrounding the death of Terrance . . . during the second interview. However, they maintained a conversational tone at all times during their questioning of [Locke-Hughes] and they did not browbeat [Locke-Hughes]. [Locke-Hughes] was soft spoken, coherent and calm throughout the interviews; he did not appear to be overwhelmed and did not breakdown but retained his composure. While Detectives Bishop and Hill referenced 'forgiveness coming with redemption', there is no evidence establishing the level of [Locke-Hughes']

---

[5] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed2d 694 (1966).

-12-

religious beliefs or that such an innocuous reference overcame his free will. Indeed, [Locke-Hughes] continued to display an even emotional state rather than being rattled by the questioning.

The motion to quash was denied.

Locke-Hughes' jury trial began on January 23, 2024. The aforementioned police officers, medical personnel, and Bethell testified at trial on behalf of the prosecution as provided above. Expert witness in forensic pathology, Dr. Jonathan Arden, was the only defense witness at trial. Arden reviewed the materials from the medical examiner, including the autopsy report and photos, records from EMS, police reports, Terrance's prior medical records, and Locke-Hughes' two interviews with police. He stated the autopsy revealed Terrance's lungs were hyperinflated, gastric contents had been aspirated into his lungs, and bruising in different places on Terrance's body, including his head and mild head injuries. Arden stated that a person can die from aspirating gastric contents, although the person's cause of death would not be drowning. A person who drowns typically has lungs that are full of extra fluid, but Terrance's were overfilled with air due to the resuscitation efforts. Arden said Terrance had no significant head trauma that would have rendered him unconscious or cause him to die. The hemorrhage noted in the autopsy report was only on the surface of Terrance's brain and did not affect his brain. Terrance's scalp injuries were superficial and would not have caused significant harm or death. The scalp injuries also may not have occurred on the same day and could have been caused by Terrance's acts of self-harming behavior. Arden opined that Terrance's CHARGE syndrome could have potentially caused him to aspirate his gastric contents, which could in turn have caused him to collapse in the water and drown. Arden also did not believe rigor mortis caused Terrance's clenched jaw because it occurred in too short of a time for rigor mortis to develop.

Arden concluded that Terrance's cause of death was drowning and agreed with the manner being indeterminate. Arden believed that the "although the totality of the facts and circumstances [were] consistent with an accident, they are potentially consistent with at least one other choice." Terrance's injuries were not consistent with his head being held underwater. Arden could not say with medical certainty that CHARGE syndrome caused Terrance's death. On cross-examination, when asked if Terrance could have been held down under water, Arden replied, "it is within the realm of possibility[.]"

Following Arden's testimony, the prosecution and defense delivered closing arguments, and the jury was sent to deliberate. During deliberations, the jury submitted two separate questions to the court. First, they asked, "can first-degree child abuse be put with lesser murder charge?" The parties agreed to answer the question in the affirmative. The next day, the jury submitted another question, "in Michigan's law for first-degree murder, are one of the elements child abuse?" The Court stated that the question had been discussed in chambers and that the parties agreed that they would respond by instructing the jury to review the instructions already provided, including

-13-

the elements of each count. The jury returned its verdict, finding Locke-Hughes guilty of first-degree child abuse, and guilty of the lesser included offense of involuntary manslaughter.

The trial court sentenced Locke-Hughes to 90 months to 30 years for first-degree child abuse and 43 months to 15 years for involuntary manslaughter, to run concurrently. On the first-degree child abuse sentence, the trial judge departed downward by 45 months from the recommended guidelines. In justifying this departure, the trial court acknowledged Locke-Hughes' acceptance of some responsibility, lack of prior criminal history, and the complex circumstances surrounding Terrance's care.

Locke-Hughes subsequently moved for entry of judgment of acquittal/for a new trial, raising the same four issues that are raised in the instant appeal. The motion was denied by the trial court. Locke-Hughes filed this appeal. The prosecution filed a cross-appeal, arguing that the trial court abused its discretion in issuing a sentence that departed downward from the recommended guidelines.

## II. ANALYSIS

There was sufficient evidence presented at trial to support Locke-Hughes' first-degree child abuse conviction. However, because the most critical evidence to support the requisite intent came from a custodial interrogation performed without the benefit of *Miranda* warnings, Locke-Hughes is entitled to a new trial on all charges.[6]

### A. LOCKE-HUGHES' FIRST-DEGREE CHILD ABUSE CONVICTION WAS SUPPORTED BY SUFFICIENT EVIDENCE

There is no preservation requirement when raising a sufficiency of the evidence issue on appeal. *People v Hawkins*, 245 Mich App 439, 457; 628 NW2d 105 (2001). This Court reviews whether a conviction lacks sufficient evidence de novo. *People v Osby*, 291 Mich App 412, 415; 804 NW2d 903 (2011). This Court must view the evidence in the light most favorable to the prosecution to "determine whether a rational trier of fact could find that the essential elements of the crime were proved beyond a reasonable doubt." *People v Alter*, 255 Mich App 194, 201-202; 659 NW2d 667 (2003). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).

---

[6] Given our resolution of this issue, we decline to address Locke-Hughes' remaining claims and the prosecution's cross-appeal. See *Kosmyna v Botsford Community Hosp*, 238 Mich App 694, 702; 607 NW2d 134 (1999).

-14-

A conviction lacking sufficient evidence violates a defendant's right to due process under the Fourteenth Amendment of the United States Constitution. *Jackson v Virginia*, 443 US 307, 316; 99 S Ct 2781; 61 L Ed 2d 560 (1979) (explaining that an "essential" guarantee of due process is the protection against conviction except where there is "evidence . . . to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense"). Unless "sufficient evidence" against a defendant has been introduced, a "judgment of acquittal should be entered." *People v Hampton*, 407 Mich 354, 368; 285 NW2d 284 (1979). The mere fact that there is "some evidence" against a defendant, however, does not necessarily imply that there is also proof beyond a reasonable doubt. *Id.* (holding that a court may grant a directed verdict of acquittal even where "some evidence" has been admitted).

On appeal, Locke-Hughes argues that his first-degree child abuse conviction was not supported by sufficient evidence. Specifically, Locke-Hughes claims no evidence showed that he knowingly or intentionally drowned Terrance.

"A person is guilty of child abuse in the first degree if the person knowingly or intentionally causes serious physical harm or serious mental harm to a child." MCL 750.136b(2); *People v Lane*, 308 Mich App 38, 57; 862 NW2d 446 (2014). "Knowingly or intentionally" requires the prosecution must prove that the defendant intended to cause serious physical harm or that he knew that serious physical harm would be caused by his actions. *People v Maynor*, 470 Mich 289, 295-296; 683 NW2d 565 (2004). Here, the trial court found that "sufficient evidence was presented for the jury to find [Locke-Hughes] knew that the natural and probable consequences of his intentional acts included death to Terrance[.]" We agree.

There was some, albeit not sufficient, evidence of first-degree child abuse through circumstantial evidence such as the video of Terrance playing in the bath that was played at trial, Bethell's testimony relating to Terrance's positive experiences with bathtime generally, and the passage of time from the call records between Bethell and Locke-Hughes.

Pietrangelo's examination of Terrance revealed injuries to Terrance's scalp and hemorrhaging to his shoulder blades, back trunk area, and left shoulder blade, that she did not attribute to CPR efforts. She also observed fresh hemorrhage in the soft tissues around the tenth, eleventh, and twelfth lower ribs, fresh abrasion on the left lower chest, and fresh hemorrhage in the sacral area—which are consistent with blunt force trauma due to Terrance's body impacting the sides or bottom of the bathtub. However, the two forensic pathologists who testified at trial could not say this was a homicide, as opposed to an accident, and both cited "indeterminate" as the manner of death.

During closing argument, the prosecutor stated that she did not think that Locke-Hughes "intentionally set out to kill Terry that day." The same is true of Hill, who during the April 6 interview stated multiple times that he thought it was an accident and that Locke-Hughes never meant to hurt Terrance. These facts, taken in the light most favorable to the prosecutor, indicate

-15-

opportunity, but do not offer much in the way of intent. That only comes through the second interview where the following relevant exchanges take place:

*Hill*: Were you holding him down?

*Locke-Hughes*: Yeah.

*Hill*: How were you holding him down?

*Locke-Hughes*: With his shoulders. But I never put his head under the water.

\* \* \*

*Hill*: Was [Terrance] fighting you at all?

*Locke-Hughes*: Not really at all.

\* \* \*

*Hill*: How long were you holding him there?

*Locke-Hughes*: No longer than 30-45 seconds.

\* \* \*

*Hill*: Were you frustrated with him?

*Locke-Hughes*: I wasn't frustrated with him. I never get frustrated with him.

*Hill*: But what was the reason you were holding his shoulders down?

*Locke-Hughes*: I really – I don't know.

\* \* \*

*Hill*: Why were you holding him down in the water like that?

*Locke-Hughes*: Because he didn't like being washed . . . . and I had to get the soap off of him.

Viewed in a light most favorable to the prosecution, the evidence presented at trial through the April 6 interview video indicated that Locke-Hughes knowingly and intentionally held Terrance down in the bathtub. Locke-Hughes admits repeatedly that he held Terrance's shoulders down in the bathtub that night. Because of this video specifically, and Locke-Hughes' statements made therein, there was sufficient evidence to support the jury's conviction for first-degree child abuse.

## B. THE TRIAL COURT ERRED IN ADMITTING LOCKE-HUGHES' CUSTODIAL STATEMENTS DURING THE APRIL 6 INTERVIEW WITHOUT GIVING MIRANDA WARNINGS

This Court reviews de novo a trial court's decision on a motion to suppress but reviews all underlying factual findings for clear error. *People v Elliott*, 494 Mich 292, 300-301; 833 NW2d 284 (2013). "The ultimate question whether a person was 'in custody' for purposes of *Miranda* warnings is a mixed question of fact and law, which must be answered independently by the reviewing court after review de novo of the record." *Barritt*, 325 Mich App at 561 (quotation marks and citations omitted). A trial court's factual findings concerning the circumstances surrounding statements to the police are reviewed for clear error. *Id*. "A finding is clearly erroneous if, after reviewing the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." *Id*. "The United States Supreme Court has determined that the erroneous admission of a confession into evidence is a nonstructural defect that does not justify automatic reversal but, instead, requires a harmless-error analysis." *People v Whitehead*, 238 Mich App 1, 7; 604 NW2d 737 (1999), citing *Arizona v Fulminante*, 499 US 279, 295; 111 S Ct 1246, 113 L Ed 2d 302 (1991). In declaring a constitutional error as harmless, "[t]he court must determine, beyond a reasonable doubt [,] that there is no reasonable possibility that the evidence complained of might have contributed to the conviction." *Whitehead*, 238 Mich App at 7-8 (quotation marks omitted; alteration in original).

Both the United States and Michigan Constitutions protect citizens against self-incrimination and afford due process of law. US Const, Ams V and XIV; Const 1963, art 1, § 17. *Miranda* enforced these constitutional protections by requiring that "the police must warn a defendant of his or her constitutional rights if the defendant is taken into custody for interrogation." *Barritt*, 325 Mich App at 561. "Statements made by a defendant to the police during a custodial interrogation are not admissible unless the defendant voluntarily, knowingly, and intelligently waives the constitutional right against self-incrimination." *Id*. at 561-562.

Here, both parties agree that Locke-Hughes was not advised of his *Miranda* rights during his second interview[7] with law enforcement on April 6. Locke-Hughes argues that he should have been Mirandized particularly because (1) he was brought to the station under false pretenses and did not voluntarily present himself for an interview; (2) he was not told that he could leave at any time; (3) the nature of the interview was coercive; (4) and the officer originally disclosed that charges would likely follow.

In determining whether a person is in custody for purposes of a *Miranda* analysis, we must first ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave. *Barritt*, 325 Mich App at 562 (quotation marks and citations omitted). "[I]n order to determine how a suspect would have 'gauge[d]' his or her 'freedom of movement,' courts must examine 'all of the circumstances surrounding the interrogation . . . .' " *Id*., quoting *Stansbury v California*, 511 US 318, 322, 325; 114 S Ct 1526; 128 L Ed 2d 293 (1994). The relevant circumstances to consider include: (1) the location of the questioning, (2) the duration of the questioning, (3) statements made during the interview, (4) the presence or absence of physical restraints during the questioning, and (5) the release of the interviewee at the end of the questioning. *Id*. A reviewing Court must consider the totality of the circumstances when deciding whether an individual was subjected to custodial interrogation under *Miranda*; no one circumstance is controlling. *Id*.

Turning first to the location, Locke-Hughes was questioned at the police station. A police station is a "police-dominated atmosphere" as contemplated by *Miranda* and accordingly weighs in favor of finding a custodial environment. *Id*. at 545. Although this fact alone is not dispositive, *id*. at 565, the officers here were armed during Locke-Hughes' interview, the door to the room was shut, and the officers were sitting between Locke-Hughes and the door, with their backs to the door. Taking these facts together, we believe a reasonable person would not have felt at liberty to leave or terminate the interview, and thus, this factor weighs in favor of finding that Locke-Hughes was in custody.

Second, we consider the duration of the interview. In *Barritt*, a 90-minute-long interview was deemed neutral. *Id*. at 569. In reaching this conclusion, the *Barritt* court compared *Yarborough v Alvarado*, 541 US 652, 663; 124 S Ct 2140; 158 L Ed 2d 938 (2004)—where a two-hour interview weighed in favor of finding custody—to *Oregon v Mathiason*, 429 US 492, 495; 97 S Ct 711; 50 L Ed 2d 714 (1977), which determined that a half-hour interview did not constitute custody. *Barritt*, 325 Mich App at 569-670. This Court has also found an interview duration of 69 minutes to be neutral. *People v Lewinski*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 365350); slip op at 5. Locke-Hughes' interview lasted for 1 hour and 11 minutes.

---

[7] Locke-Hughes was interviewed twice by law enforcement in connection with this case; first, on December 28, 2021, and again on April 6, 2022. Locke-Hughes' *Miranda* challenge only focuses on the second interview, and therefore, so does our analysis herein.

-18-

Comparing this length of time against these relevant cases, we conclude that the duration of Locke-Hughes' April 6 interview is neutral or disfavors a finding of custody.

Regarding the third factor—statements made during the interview—the "failure to tell a suspect that he or she is free to leave is one factor that can contribute to a finding that a suspect was in custody." *Id*. "If an officer did not tell [the] defendant that he was free to leave . . . , [this fact] weigh[s] in favor of the view that [the] defendant was in custody." *Id*. (quotation marks omitted; alterations in original). At no point during the April 6 interview did law enforcement tell Locke-Hughes that he was free to leave. Locke-Hughes began to make some incriminating statements about twenty-five minutes into the interview and the officers continued questioning him for nearly an hour. Thus, we conclude this factor weighs in favor of finding that Locke-Hughes would not have felt free to leave or terminate the interview.

Fourth, we consider the presence or absence of physical restraints during the questioning. "Generally, the lack of handcuffs weighs against a finding of custody." *Barritt*, 325 Mich App at 575. "However, other forms of restraint may support a finding of custody." *Lewinski*, ___ Mich App at ___; slip op at 5. In *Barritt*, the trial court found that Barritt being in the presence of at least one armed police officer at all times constituted a restraint, and this Court agreed. *Barritt*, 325 Mich App at 575-576. Likewise, in *Lewinski*, Lewinski was not handcuffed or interrogated at a police station, but rather was questioned while receiving treatment in a hospital bed. The detectives conducting the interview were standing between Lewinski's hospital bed and the door to the room, which was shut. They were also armed. This Court concluded:

> [E]ven though [Lewinski] was not handcuffed, [he] could not get out of bed and leave the hospital but, more importantly, it is not likely that the detectives would have allowed [him] to get out of bed and leave the hospital, i.e., [Lewinski] would have been restrained at such an attempt. [*Lewinski*, ___ Mich App at ___; slip op at 5.]

Here, the officers were armed during Locke-Hughes' interview, the door to the room was shut, and the officers were sitting between Locke-Hughes and the door, with their backs to the door. Thus, this factor weighs in favor of finding that Locke-Hughes would not have felt free to leave or terminate the interview.

The fifth and final factor to consider is whether the interviewee was released after questioning. There is no dispute that Locke-Hughes was released, which weighs against custody.

Based on the totality of the circumstances, we believe the trial court erred. A reasonable person in Locke-Hughes' position would not have felt free to terminate the interview and leave.

Next, we turn to the second consideration in determining whether Locke-Hughes was "in-custody" for purposes of deciding whether he was subjected to custodial interrogation under *Miranda*. "As our Supreme Court and the United States Supreme Court have stated, determining

-19-

whether an individual's freedom of movement was curtailed is the first step in the analysis, not the last." *Lewinski*, ___ Mich App at ___; slip op at 6, citing *Barritt*, 325 Mich App at 580. The next step asks "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Barritt*, 325 Mich App at 581. We disagree with the trial court and believe that Locke-Hughes' interview took place in a coercive environment.

To begin, Hill himself conceded that the nature of the April 6 interview was different from the December 28 interview. On April 6, the officers' questions were leading, presumptive, and increasingly accusatory. Throughout the interview, the officers made various responses pushing back and doubting Locke-Hughes' version of the story, including, "that's not what happened, and you know that's not what happened." The officers frequently referenced "god" and inferred that Locke-Hughes must be carrying guilt for which he should confess and seek forgiveness. They reminded Locke-Hughes that, if he did not confess, he would be "portrayed as a monster" and continued to play on Locke-Hughes' emotions by showing pictures of Terrance, saying how he did not deserve to die this way and how Terrance loved Locke-Hughes. Although the tactics used here do not share the level of hostility as the officers in *Barritt*, the accusatory statements made by the officers here had a coercive effect. See *People v Gerwatowski*, ___ Mich App ___, ___; ___ NW3d ___ (2026) (Docket No. 374157); slip op at 5 ("The officers were accusatory toward [Gerwatowski] by suggesting that she either made a bad decision or was a monster, which weighs in favor of a finding that [she] was in custody."). The trial court took no issue with Hill and Bishop's religious references because "there is no evidence establishing the level of [Locke-Hughes'] religious beliefs or that such an innocuous reference overcame his free will." We do not believe that Locke-Hughes' religion (or lack thereof) bears any relevance here. We further believe that the effect of the statements made by these officers was coercive, particularly for a 20-year-old person with no prior criminal charges.

We also observe coercion in how the interview was initiated. The prosecution emphasizes that Locke-Hughes came down to the station voluntarily. This is true, but also misleading, as Locke-Hughes was asked to come down to the station for the purpose of picking up his phone. But, Locke-Hughes left the interview *without* his phone, which Hill said he needed to "hang onto" at the end of the interview, and even asked Locke-Hughes to sign a document indicating that he was supposed to pick up his phone that day but ultimately was unable to do so. As such, we cannot say that Locke-Hughes' decision to come to the station was entirely voluntary.

Accordingly, we conclude that a reasonable person in Locke-Hughes' position would not have felt at liberty to terminate the interrogation and leave, and the environment presented the same coercive pressures as the type of station house questioning in *Miranda*. Therefore, Locke-Hughes was "in custody," and his Fifth Amendment rights were violated when he was not advised of his *Miranda* rights at any time during his April 6 interview.

Having found a *Miranda* violation in the admission of the April 6 interview as evidence at trial, we next turn to remedy. "[A] reviewing court [must] conduct a thorough examination of the record. If, at the end of that examination, the court cannot conclude beyond a reasonable doubt

that the jury verdict would have been the same absent the error [,] . . . it should not find the error harmless." *Whitehead*, 238 Mich App at 9. Thus, "the question before us is whether, absent the confession, honest, fair-minded jurors might very well have brought in not-guilty verdicts." *Id*. (quotation marks and citation omitted). "If the proof against defendant was so overwhelming that all reasonable jurors would have found guilt even without the confession being brought into evidence, the conviction must stand." *Id*. at 10.

Here, we cannot say that reasonable jurors would have found Locke-Hughes guilty of first-degree child abuse absent admission of the April 6 interview video. The evidence against Locke-Hughes, independent of this video, as detailed above, was circumstantial and not overwhelming. Though the evidence at trial revealed that Locke-Hughes had the opportunity to commit first-degree child abuse against Terrance, it did not indicate the requisite intent. The April 6 video was the only piece of evidence revealing potential intent, and thus, there is a reasonable possibility that a factfinder would have acquitted Locke-Hughes of this charge had it not been played at trial. As such, we conclude this error was not harmless and warrants reversal.

We vacate Locke-Hughes' convictions and remand for a new trial. We do not retain jurisdiction.

/s/ Adrienne N. Young
/s/ Stephen L. Borrello
/s/ Christopher M. Trebilcock

-21-